Thomas P. Brown (*pro hac vice*)
tombrown@paulhastings.com
PAUL HASTINGS LLP
55 Second Street, Twenty-Fourth Floor
San Francisco, CA 94105
Telephone: (415) 856-7000
Fax: (415) 856-7100

Brent E. Johnson (7558)
bjohnson@hollandhart.com
Rebecca A. Ryon (11761)
raryon@hollandhart.com
HOLLAND & HART LLP
222 South Main, Suite 2200
Salt Lake City, Utah  84101
Telephone: (801) 799-5800
Fax: (801) 799-5700

*Attorneys for Defendants Bill Me Later, Inc.,
eBay, Inc., and PayPal, Inc.*

Gary Bendinger
gbendinger@sidley.com
Mark E. Haddad (admitted *pro hac vice*)
mhaddad@sidley.com
Sean A. Commons (admitted *pro hac vice*)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Defendant WebBank*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KYLE SAWYER, Individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>vs.<br><br>BILL ME LATER, INC., EBAY INC., PAYPAL, INC., and DOES 1-100,<br><br>  Defendants. | **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)**<br><br><br>Case No. 2:11-cv-00988-CW<br><br>Judge Clark Waddoups |

**TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

INTRODUCTION ............................................................................................................................ 1

STATEMENT OF THE CASE........................................................................................................ 2

I.      PLAINTIFF'S CLAIMS ................................................................................................... 2

II.     THE CHALLENGED LENDING PROGRAM ................................................................ 4

III.    PROCEDURAL HISTORY............................................................................................... 5

LEGAL STANDARD..................................................................................................................... 6

ARGUMENT................................................................................................................................... 7

        I.      PLAINTIFF'S CALIFORNIA CLAIMS FAIL BECAUSE HE IS
BOUND BY A UTAH CHOICE-OF-LAW CLAUSE AND BECAUSE,
EVEN UNDER CALIFORNIA LAW, HIS CLAIMS FAIL AS A
MATTER OF LAW ........................................................................................................ 7

                A.      The Utah Choice-Of-Law Clause Disposes of Plaintiff's Usury,
Late Fee, and  UCL Claims.......................................................................... 7

                B.      Even Under California Law, Plaintiff Cannot Pursue CLRA, Late
Fee, UCL, and Aiding and Abetting Claims as a Matter of Law............. 16

        II.     FEDERAL LAW EXPRESSLY PREEMPTS PLAINTIFF'S
CALIFORNIA CLAIMS BECAUSE THE LOAN WAS MADE BY A
UTAH-CHARTERED, FEDERALLY INSURED BANK ............................... 24

                A.      Overview of FDIC Supervision of The Challenged Loan Program ........ 25

                B.      Section 27 Expressly Preempts Plaintiff's Claims................................... 29

        III.    PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH
PREJUDICE ................................................................................................... 43

CONCLUSION............................................................................................................................ 44

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Abat v. Chase Bank USA, N.A.*,
738 F. Supp. 2d 1093 (C.D. Cal. 2010) ..................................................................................14

*ABF Capital Corp. v. Osley*,
414 F.3d 1061 (9th Cir. 2005) ...............................................................................................7

*Anderson v. First Sec. Corp.*,
249 F. Supp. 2d 1256 (D. Utah 2002).....................................................................................43

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009).........................................................................................................6

*Augustine v. FIA Card Servs., N.A.*,
485 F. Supp. 2d 1172 (E.D. Cal. 2007)...................................................................................16

*Basic Research v. Bdirect*,
No. 06-932, 2007 U.S. Dist. LEXIS 91705 (D. Utah Dec. 13, 2007) .....................................15

*Becker v. Wells Fargo Bank, N.A.*,
No. 10-2799, slip op. at 35 (E.D. Cal. March 22, 2011)..........................................................18

*Bottoni v. Sallie Mae, Inc.*,
No. 10-3602, 2011 U.S. Dist. LEXIS 18874 (N.D. Cal. Feb. 11, 2011) ...............16, 19, 20, 21

*Bottoni v. Sallie Mae, Inc.*,
No. 10-3602, 2011 U.S. Dist. LEXIS 61626 (N.D. Cal. June 8, 2011).............................19, 20

*Boyd Rosene & Assoc's v. Kansas Mun. Gas Agency*,
174 F.3d 1115 (10th Cir. 1999) ..............................................................................................9

*Chamber of Commerce of United States v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ..............................................................................................29

*Chevron Pipe Line Co. v. Pointe Perry, L.C.*,
No. 08-981, 2011 U.S. Dist. LEXIS 112092 (D. Utah Sept. 29, 2011)....................................7

*Cohon v. State Dep't of Health*,
646 F.3d 717 (10th Cir. 2011) ..............................................................................................42

*Consumer Solutions Reo, LLC, v. Hillery*,
658 F. Supp. 2d 1002 (N.D. Cal. 2009) .................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

*Dunn v. GMAC Mortg., LLC,*
No. 10-3196, 2011 WL 1230211 (E.D. Cal. Mar. 28, 2011) .................................................. 18

*FDIC v. Lattimore Land Corp.,*
656 F.2d 139 (5th Cir. 1981) ................................................................................... 31, 35

*Flowers v. EZPawn Okla., Inc.,*
307 F. Supp. 2d 1191 (N.D. Okla. 2003) ................................................................. 39

*GFF Corp. v. Assoc. Wholesale Grocers, Inc.,*
130 F.3d 1381 (10th Cir. 1997) ................................................................................. 6

*Greenwood Trust Co. v. Mass.,*
971 F.2d 818 (1st Cir. 1992) .......................................................................... 24, 28, 30

*Griffith v. Conn.,*
218 U.S. 563 (1910) ................................................................................................ 38

*Gutierrez v. Wells Fargo & Co.,*
622 F. Supp. 2d 946 (N.D. Cal. 2009) ................................................................ 16, 17

*Hudson v. ACE Cash Express, Inc.,*
No. 01-1336, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. May 30, 2002) .......................... passim

*Huff v. Liberty League Int'l, LLC,*
No. 08-1010, 2009 WL 1033788 (C.D. Cal. Apr. 14, 2009) .................................... 13

*In re Checking Account Overdraft Litig.,*
694 F. Supp. 2d 1302 (S.D. Fla. 2010) ................................................................... 16

*In re Hein,*
60 B.R. 769 (S.D. Cal. 1986) .................................................................................. 20

*In re Lara (Zager v. Lara),*
731 F.2d 1455 (9th Cir. 1984) ................................................................................. 38

*In re Late Fee & Over-Limit Fee Litig.,*
528 F. Supp. 2d 953 (N.D. Cal. 2007) ................................................................... 17

*Justo v. IndyMac Bancorp,*
No. 09-1116. 2010 WL 623715 (C.D. Cal. Feb. 19, 2010) ..................................... 18

*King v. PA Consulting Group, Inc.,*
485 F.3d 577 (10th Cir. 2007) .................................................................................. 9

## TABLE OF AUTHORITIES

**Page(s)**

*Krispin v. May Dep't Stores Co.*,
　218 F.3d 919 (8th Cir. 2000) ...................................................................................................31

*Lieberman v. A & W Rests., Inc.*,
　No. 02-2930, 2003 WL 21252008 (D.C. Minn. 2003) ............................................................42

*Marine Bank v. Weaver*,
　455 U.S. 551 (1982) .................................................................................................................38

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
　439 U.S. 299 (1978) .................................................................................................................31

*McBride v. Market Street Mortg.*,
　381 Fed. Appx. 758 (10th Cir. 2010) .........................................................................................8

*McGrary v City of Portland*,
　386 F.3d 1259 (9th Cir. 2004) .................................................................................................41

*Medimatch, Inc. v. Lucent Techs. Inc.*,
　120 F. Supp. 2d 842 (N.D. Cal. 2000) .......................................................................................9

*Medtronic, Inc. v. Lohr*,
　518 U.S. 470 (1996) .................................................................................................................29

*Melt Franchising, LLC v. PMI Enters., Inc.*,
　No. 08-4148, 2009 WL 32587 (C.D. Cal. Jan. 2, 2009) .........................................................13

*Miller v. Yokohama Tire Corp.*,
　358 F.3d 616 (9th Cir. 2004) ...................................................................................................23

*Mountain Fuel Supply v. Reliance Ins. Co.*,
　933 F.2d 882 (10th Cir. 1991) .................................................................................................15

*Munoz v. Pipestone Fin., LLC*,
　513 F. Supp. 2d 1076 (D. Minn. 2007) ....................................................................................35

*Mutual Loan Co. v. Martell*,
　222 U.S. 225 (1911) .................................................................................................................38

*Oatway v. Option One Mortg. Corp.*,
　No. 10-8188, slip op. at 5-6 (C.D. Cal. March 2, 2011) .........................................................18

*Olvera v. Blitt & Gaines, P.C.*,
　431 F.3d 285 (7th Cir. 2005) ..............................................................................................35, 36

# TABLE OF AUTHORITIES

**Page(s)**

*Palestini* v. *Homecomings Fin., LLC*,
   No. 10-1049, 2010 WL 3339459 (S.D. Cal. Aug. 23, 2010)...................................................18

*Perlas v. Mortg. Elec. Registration Sys., Inc.*,
   No. 09-4500, 2010 WL 3079262 (N.D. Cal. Aug. 6, 2010) ...................................................18

*Petters Co. v. BLS Sales, Inc.*,
   No. 04-2160, 2005 WL 2072109 (N.D. Cal. Aug. 26, 2005) ..................................................10

*Reynoso v. Paul Fin., LLC*,
   No. 09-3225, 2009 WL 3833298 (N.D. Cal. Nov. 16, 1999) ...........................................16, 18

*S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*,
   641 F.2d 746 (9th Cir. 1981) .................................................................................................15

*Sarlot-Kantarjian v. First Penn. Mortg. Trust*,
   599 F.2d 915 (9th Cir. 1979) .................................................................................................10

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 n.1 (1996).........................................................................................................30

*Smith v. United States*,
   561 F.3d 1090 (10th Cir. 2009) ...............................................................................................4

*Sonoda v. Amerisave Mortg. Corp.*,
   No. 11-1803, 2011 WL 2690451 (N.D. Cal. July 8, 2011) .....................................................18

*Tarrant Reg'l Water Dist. v. Herrmann*,
   656 F.3d 1222 (10th Cir. 2011) .............................................................................................29

*Tostado v. Citibank (South Dakota), N.A.*,
   No. 09-549, 2010 U.S. Dist. LEXIS 228 (W.D. Tex. Jan. 4, 2010) .................................35, 41

*Ubaldi v. SLM Corp.*,
   No. 11-1320, slip op. (N.D. Cal. Feb. 13, 2012)................................................................41, 42

*United States v. Gonzales*,
   520 U.S. 1 (1997)...................................................................................................................30

*Van Slyke v. Capital One Bank*,
   503 F. Supp. 2d 1353 (N.D. Cal. 2007) ............................................................................16, 17

*Ventura v. 1st Fin. Bank USA*,
   No. 03-4515, 2005 WL 2406029 (N.D. Cal. Sept. 29, 2005).......................................8, 14, 15

# TABLE OF AUTHORITIES

**Page(s)**

*Wells Fargo Bank N.A. v. Boutris*,
    419 F.3d 949 (9th Cir. 2005) .................................................................................23

*Wilcox v. EMC Mortg. Corp.*,
    No. 10-1923, slip op. at 10 (C.D. Cal. July 25, 2011) ..........................................18

*Young v. Wells Fargo & Co.*,
    671 F. Supp. 2d 1006 (S.D. Iowa 2009) ..........................................................17, 18

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................................9

**STATE CASES**

*Alvarado v. Selma Convalescent Hosp.*,
    153 Cal. App. 4th 1292 (2007) ..............................................................................23

*Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.*,
    927 P.2d 186 (Utah 1996).......................................................................................7

*Application Grp., Inc. v. Hunter Grp., Inc.*,
    72 Cal. Rptr. 2d 73 (Ct. App. 1998).......................................................................15

*Ball v. Fleet Boston Fin. Corp.*,
    164 Cal. App. 4th 794 (2008) .................................................................................18

*Bardin v. DaimlerChrysler Corp.*,
    136 Cal. App. 4th 1255 (2006) ...............................................................................22

*Bekins Bar V Ranch v. Huth*,
    664 P.2d 455 (Utah 1983).......................................................................................13

*Berry v. Am. Express Publ'g*,
    147 Cal. App. 4th 224 (2007) .................................................................................17

*Carlson v. Hamilton*,
    332 P.2d 989 (Utah 1958).......................................................................................13

*Coroles v. Sabey*,
    79 P.3d 974 (Utah Ct. App. 2003) ..........................................................................24

*CQL Original Prods., Inc. v. Nat'l Hockey League Players Ass'n*,
    39 Cal. App. 4th 1347 (1995) .............................................................................9, 14

## TABLE OF AUTHORITIES

**Page(s)**

*Fairbanks v. Super. Ct.*,
    46 Cal. 4th 56 (2009) ...............................................................................17, 18, 19, 20

*Gamer v. duPont Glore Forgan, Inc.*,
    65 Cal. App. 3d 280 (1976) ..........................................................................................10

*Hitz v. First Interstate Bank*,
    38 Cal. App. 4th 274, 44 Cal. Rptr. 2d 890 (1995)......................................................20

*Hughes Elecs. Corp. v. Citibank Del.*,
    120 Cal. App. 4th 251 (2004) .........................................................................................8

*Jones v. Wells Fargo Bank*,
    112 Cal. App. 4th 1527 (2003) .....................................................................................10

*Kearney v. Salomon Smith Barney, Inc.*,
    39 Cal. 4th 95 (2006) ....................................................................................................15

*Nedlloyd Lines B.V. v. Super. Ct.*,
    3 Cal. 4th 459 (1992) ........................................................................................7, 8, 9, 14

*Net2Phone v. Super. Ct.*,
    109 Cal. App. 4th 583 (2003) .......................................................................................12

*People ex rel. Dep't of Transp. v. Naegele Outdoor Adver. Co. of Cal.*,
    38 Cal. 3d 509 (1985) ...................................................................................................23

*Prows v. Pinpoint Retail Systems, Inc.*,
    868 P.2d 809 (Utah 1993)...............................................................................................8

*Ridgley v. Topa Thrift & Loan Ass'n*,
    17 Cal. 4th 970 (1998) ..................................................................................................20

*Shvarts v. Budget Group, Inc.*,
    81 Cal. App. 4th 1153 (2000) .......................................................................................23

*Southwest Concrete Prods. v. Gosh Constr. Corp.*,
    51 Cal. 3d 701 (1990) ..............................................................................................10, 11

*Ury v. Jewelers Acceptance Corp.*,
    227 Cal. App. 2d 11 (1964) .............................................................................8, 10, 11, 12

*Util. Consumers' Action Network, Inc. v. AT&T Broadband of S. Cal., Inc.*,
    37 Cal. Rptr. 3d 827 (Ct. App. 2006)...........................................................................12

## TABLE OF AUTHORITIES

**Page(s)**

*Woodhaven Apartments v. Washington*,
  942 P.2d 918 (Utah 1997) ................................................................................................12


**FEDERAL STATUTES AND REGULATORY MATERIALS**

12 U.S.C. § 85 ....................................................................................................................31, 41

12 U.S.C. §§ 1463(g) ..............................................................................................................29

12 U.S.C. § 1813(a)(1)-(2) ......................................................................................................27

12 U.S.C. § 1813 (c) ................................................................................................................27

12 U.S.C. § 1818(b)(1) ............................................................................................................29

12 U.S.C. § 1820(b), (d) .......................................................................................................5, 25

12 U.S.C. § 1831d(a) ...............................................................................................................28

12 U.S.C. § 1867(c) .......................................................................................................... passim

15 U.S.C. § 1601 *et seq.*..........................................................................................................37

15 U.S.C. § 1602(g) .................................................................................................................37

12 C.F.R. pt. 1026, Supp. I, Comment 2(a)(17)(i)-2 ..............................................................37

12 C.F.R. § 226.2(a)(17)(i) ......................................................................................................37

12 C.F.R. § 337.12(a)-(c)..............................................................................................5, 25, 26

Fed. R. Civ. P.12(b)(6)...................................................................................................6, 24, 42

72 Fed. Reg. 50580, 50581-82 (Aug. 31, 2007) .....................................................................33

126 Cong. Rec. 6900 (Mar. 27, 1980) ....................................................................................29

FDIC General Counsel's Op. 10, 63 Fed. Reg. 19258 (Apr. 17, 1998).......................................30

FDIC Risk Management Manual § 1.1, available at
  www.fdic.gov/regulations/safety/manual/index.html.............................................................25

Section 521 of the Depository Institutions Deregulation and Monetary Control Act of
  1980, Pub. L. No. 96-221, 94 Stat. 132 (1980) .................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

OCC Interpretive Letter No. 948 (Oct. 23, 2002)..............................................................36

http://www.fdic.gov/news/news/financial/2003/FIL0302a.html.................................................29

http://www.occ.gov/static/interpretations-and-precedents/dec02/int948.pdf. ..............................36

https://www2.fdic.gov/starsmail/index.asp.................................................................38

www.fdic.gov/bank/individual/enforcement/2008-06-02.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2008-06-04.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2008-06-15.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2008-10-20.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2008-12-03.pdf .......................................................34

www.fdic.gov/bank/individual/enforcement/2009-03-19.pdf. ......................................................34

www.fdic.gov/regulations/compliance/manual/index_pdf.html.....................................................26

www.fdic.gov/regulations/examinations/credit_card. ..............................................................26

www.occ.gov/static/enforcement-actions/ea2001-104.pdf............................................................33

**STATE STATUTES AND REGULATORY MATERIAL**

Cal. Bus. & Prof. Code § 10242.5 ............................................................................11

Cal. Bus. & Prof. Code § 11265.1 ............................................................................11

Cal. Bus. & Prof. Code § 21713.5 ............................................................................11

Cal. Bus. & Prof. Code § 17200 ..............................................................................22

Cal. Bus. & Prof. Code § 17208 ..............................................................................22

Cal. Civ. Code § 1646........................................................................................14

Cal. Civ. Code § 1671........................................................................................ passim

Cal. Civ. Code § 1671(a) .................................................................................11, 12, 21

# TABLE OF AUTHORITIES

**Page(s)**

Cal. Civ. Code §§ 1671(a) ...............................................................................................20

Cal. Civ. Code § 1671(c) ................................................................................................20

Cal. Civ. Code § 1675 *et seq.*........................................................................................11

Cal. Civ. Code § 1803.6 ..................................................................................................20

Cal. Civ. Code § 1812.626..............................................................................................11

Cal. Civ. Code § 1917.005 ..............................................................................................10

Cal. Civ. Code § 1917.619 ..............................................................................................10

Cal. Civ. Code § 2954.4 ..................................................................................................11

Cal. Com. Code § 2718 ...................................................................................................11

Cal. Corp. Code § 25116.................................................................................................10

Cal. Educ. Code § 92050 ................................................................................................11

Cal. Evid. Code § 622 .....................................................................................................22

Cal. Fin. Code § 1675 .....................................................................................................10

Cal. Fin. Code § 1768 .....................................................................................................10

Cal. Fin. Code § 4001(a).................................................................................................11

Cal. Fin. Code § 7675 .....................................................................................................10

Cal. Fin. Code § 12304 ...................................................................................................23

Cal. Fin. Code § 18249 ...................................................................................................11

Cal. Fin. Code § 18250 ...................................................................................................11

Cal. Fin. Code § 18631 ...................................................................................................11

Cal. Fin. Code § 22002 ...................................................................................................11

Cal. Fin. Code § 22050 ...................................................................................................23

Cal. Fin. Code § 22100 *et seq.* .....................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

Cal. Fin. Code § 22109 ................................................................................................................23

Cal. Food & Agric. § 55881 .........................................................................................................11

Cal. Food & Agric. § 56120 .........................................................................................................11

Cal. Gov't Code § 5906 ................................................................................................................10

Cal. Gov't Code § 14376 ..............................................................................................................11

Cal. Gov't Code § 53069.85 .........................................................................................................11

Cal. Gov't Code § 53088.7 ...........................................................................................................11

Cal. Gov't Code § 54348 ..............................................................................................................11

Cal. Pub. Cont. Code § 10826 ......................................................................................................12

Cal. Pub. Res. Code § 6224 ..........................................................................................................12

Cal. Sts. & High. Code §§ 5254.5 ................................................................................................12

Cal. Sts. & High. Code §§ 10503.1 ..............................................................................................12

Cal. Const. art. XV, § 1 .....................................................................................................3, 10, 35

Utah Code § 7-1-314 ....................................................................................................................25

Utah Code § 13-2-1 *et seq.* ..........................................................................................................13

Utah Code § 70C-1-101 *et seq.* ...................................................................................................14

Utah Code § 70C-2-102 ....................................................................................................12, 14, 21

Utah Code § 70C-1-201 ................................................................................................................22

Utah Code § 70C-1-302(3)(a)(i) ..................................................................................................22

Utah Code § 70C-1-302(7) ...........................................................................................................22

Commissioner's Opinion OP 6317CnFL, Cal. Dep't of Corps. (July 20, 1993) ..........................38

**TREATISES AND SECONDARY AUTHORITIES**

*Banking and Financial Services* § 5.07, at 5-44, 5-46 ................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

5B C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1357 (3d ed. 2011).........................42

Elizabeth R. Schlitz, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and its Effect on Predatory Lending Regulations,* 88 Minn. L. Rev. 518, 625 (Feb. 2004)................34

https://www.securecheckout.billmelater.com/paycapture-content/fetch?hash=PD4106KD...........5

Melanie L. Fein, *Banking and Financial Services: Banking, Securities, and Insurance Regulatory Guide,* Vol I. § 3.01, at 3-5 (2006)......................................................................25

Rest. (Second) of Conflict of Laws § 187(2) (Supp. 1988)..............................................................8

Rest. (Second ) of Conflict of Laws § 187 cmt...............................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The premise of the First Amended Complaint is that courts should subject the challenged lending program to the individual usury and late fees laws of each of the 50 states. The admissions in the Complaint, however, establish the opposite: that this is a national lending program whose interest rates and late fees are properly those permitted by Utah law, both as a result of the plain language of Plaintiff's account agreement and independently as a matter of federal usury law. Plaintiff admits he entered into a loan agreement, that CIT Bank was a party to that agreement, and that CIT Bank advanced loan funds for his purchase of a computer and retained ownership of the loan account. Although Plaintiff again avoids naming WebBank as a Defendant, WebBank's intervention establishes that WebBank succeeded CIT Bank as the owner of his account, and that both institutions are Utah-chartered, federally insured banks. This case is before this Court because the court in California concluded that WebBank's relationship to Plaintiff's account and its interest in the other loans originated through the challenged lending program gave WebBank a judicially protectable interest that supported its intervention as a Defendant in this matter and that warranted a transfer, upon WebBank's request, to this Court.

This Court should enforce the choice-of-law provision in the relevant agreement and dismiss Plaintiff's claims that the interest rates and late fees applicable to Plaintiff's loan violate California law. Plaintiff has not alleged that the interest rates and late fees violate Utah law. He also cannot overcome the presumptive validity of the choice-of-law provision because – with only one exception – it is abundantly clear that California has asserted no fundamental public policy in having courts enforce the California laws Plaintiff cites. The one exception is the California Consumer Legal Remedies Act ("CLRA"), which California courts have treated as establishing unwaivable rights. The CLRA provides no valid cause of action here, however,

1

because – as established in over a dozen dispositive decisions, including by the California Supreme Court – the CLRA does not apply to the extension of credit by any entity other than a retailer.  For these state law reasons, the Complaint fails to state a claim and the Court can and should dismiss the Complaint with prejudice on these grounds alone.

There is a second, independent, and compelling reason to dismiss the Complaint. Because WebBank and CIT Bank are Utah-chartered, FDIC-insured banks, and because they contract with consumers to establish credit accounts and fund loans, Section 27 of the Federal Deposit Insurance Act, 12 U.S.C. § 1831d, expressly preempts the application of any state law pertaining to interest rates or late fees other than the law of Utah.  The sweeping language of Section 27 expressly preempts the laws of states other than a bank's home state when applied to the finance charges on "any loan" or "other evidence of debt"; Section 27 applies here because none of the allegations of the First Amended Complaint overcomes the banks' conceded ownership of Plaintiff's credit account and the funding of his loan.  Far from being exempt from oversight, the challenged lending program, including WebBank, Bill Me Later, and all of the services that Bill Me Later provides, is subject to comprehensive federal bank regulatory scrutiny for compliance with all applicable state and federal laws.  Section 27 independently requires dismissal of the Complaint.

<b><u>STATEMENT OF THE CASE</u></b>

## I.      PLAINTIFF'S CLAIMS.

This lawsuit arises out of an online transaction in October 2008.  (Docket No. 47, Plaintiff's First Amended Complaint ("FAC") ¶ 34.)  Plaintiff Kyle Sawyer used the challenged program to obtain a loan to purchase a $1,068.08 computer from Cyberpower, Inc.  (*Id.* ¶¶ 34-35, 37-38.)  He asserts that the 19.99% APR and late fees charged on his account violated California law, and seeks to represent putative classes of California residents charged allegedly excessive

2

interest rates and fees.  Specifically, he now attempts to revive a claim under California's usury law (previously dismissed with prejudice), Cal. Const. art. XV, § 1 (FAC ¶¶ 142-47), to challenge late fees as void and unauthorized penalties under California Civil Code subsections 1671(c)-(d) (*id.* ¶¶ 116-19), to pursue alleged violations of California's Unfair Competition Law ("UCL") (*id.* ¶¶ 124-41), and to pursue alleged violations of the CLRA (*id.* ¶¶ 120-23).  He further claims that eBay aided and abetted Bill Me Later, Inc. ("BML") in committing these alleged violations.  (*Id.* ¶¶ 148-52.)  He seeks not only to recover his own interest payments and late fees in excess of what he asserts is permitted by California law, but to enjoin the continued operation of the program.

Plaintiff acknowledges that he received the relevant program terms and conditions.  (*Id.* ¶ 36.)  That agreement disclosed the annual percentage rate of 19.99%, the late fee schedule, and a Utah choice-of-law clause.[1]  (*Id.* ¶¶ 36, 38, 101; Docket No. 3-21 at 1:13-16.)  It also named CIT Bank – an FDIC-insured bank located in Utah – as the lender and owner of his account.  (FAC ¶¶ 6, 8.)  It further explained that the loan was accepted in Utah and that credit was being extended from Utah.  (*Id.*)  Plaintiff admits that CIT Bank funded his loan and paid Cyberpower on his behalf.  (FAC ¶¶ 6, 8, 34, 36; Docket No. 3-19 at 4:18-19; Docket No. 5-6 at 2.)  He also admits that CIT Bank held the associated receivables ████████████████████████████

████████████████

## II.    <u>THE CHALLENGED LENDING PROGRAM.</u>

The challenged lending program provides consumers with a method to finance online purchases.  (FAC ¶¶ 4, 47.)  Plaintiff acknowledges that Defendants offer the program

---

[1] Plaintiff admits that, although his original account agreement did not include a Utah forum selection provision, one was added while his account remained open and in use. (FAC ¶ 42.)

3

nationwide, through thousands of merchants over the Internet.  (*Id.* ¶¶ 4, 69.)  Under the program, a bank – formerly CIT Bank and, since September 2010, WebBank – offers point-of-sale credit to consumers as part of the "checkout" process.  (*Id.* ¶¶ 6, 34-35.)  To use the program, consumers provide information that allows the bank's servicing partner, BML to run a credit check and determine whether the consumer qualifies for a loan.  (*Id.* ¶¶ 34-36, 47█, 61-62.)  The loans are contingent on the customer's review and acceptance of certain terms and conditions.  (*Id.* ¶¶ 34-36.)  Once the application is approved and the consumer accepts the terms and conditions, the bank opens an account, ███████████████████████████, ████████, funds the loan advances, pays the merchant on the consumer's behalf for purchases, and retains ownership of the account.  (*Id.* ¶¶ 8, █████, 71.)  Borrowers who pay off their balance by the due date pay nothing to use the service, and the majority of borrowers "pay on time and in full."  (*Id.*¶ 103.)

CIT Bank  ████████████ until September 1, 2010.  (FAC ¶¶ 6, █.)  On that date, WebBank ██████████ ███████████████████████████████████████ and the sole entity to issue new accounts ██████████████████.  (*Id.* ¶¶ 6, ████████.)  As the new owner and current issuer of accounts, WebBank is a party named in the contracts with consumers.[2]  The WebBank terms and conditions expressly identify WebBank as the lender and

---

[2] FAC ¶¶ 101-102, 116-19 (referencing and relying upon Terms and Conditions); Declaration of Thomas P. Brown ("Brown Decl."), Ex. B., Terms and Conditions of the Bill Me Later Payment System, submitted as Exhibit 1 of Plaintiff's Motion to Compel Party CIT Bank to Produce Documents in Response to a Subpoena, *Sawyer v. CIT Bank*, No. 11-710, Docket No. 1 (August 4, 2011 D. Utah).)  The current version of the Terms and Conditions identifying WebBank as the lender is available at https://www.securecheckout.billmelater.com/paycapture-content/fetch?hash=PD4106KD&content=bmlweb/bmlwebtnc.html (last visited March 3, 2012) (Brown Decl., Ex. C.)  *See Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir. 2009) ("courts

owner of each account, that WebBank is located in Utah, and that credit is being extended from Utah.  (*Id.*) WebBank retains the receivables associated with extensions of credit under the program ███████████████████████████████████████████████████ ████████████████████████████  WebBank retains a portion of the interest that accrues during the time it holds the receivables, shares in the upside ███████████████████████ (██████ Docket No. 16-12 at 5) and, as the account owner, benefits when account holders request additional extensions of credit (Docket No. 11-21 at 9.)

The FDIC subjects Utah-chartered, federally insured banks, as well as third parties with whom they may contract for the provision of banking services, to periodic examination and comprehensive regulatory oversight.  12 U.S.C. § 1820(b), (d); 12 U.S.C. § 1867(c); 12 C.F.R. § 337.12(a)-(c).  This means that the program and BML also are subject to examination and regulatory oversight, as Plaintiff acknowledges.  (FAC ¶¶ 2, 6.)  *See* 12 U.S.C. § 1867(c) (commonly known as the "Bank Service Company Act").

III.   **PROCEDURAL HISTORY.**

WebBank moved to intervene as a defendant, both permissively and as of right, to both defend the validity of the terms of its agreements with consumers, including the Utah forum selection and choice-of-law clauses, and to ensure that any decision on the applicability of federal law to the lending program reflected WebBank's position on that issue.  The California district court granted WebBank's motion to intervene in full.  (*See* Docket No. 11-21 at 12 ("[WebBank's] Motion to Intervene as Defendant is GRANTED.")  Although the FAC does not name WebBank as a defendant, Plaintiff has confirmed that he does not intend to relitigate the

---

may consider not only the complaint itself, but also . . . documents incorporated into the complaint").

existing order granting WebBank the right to participate in this litigation "as Defendant," and will not oppose this motion to dismiss on that ground.

Prior to WebBank's intervention as a Defendant, and the order transferring this case to Utah, the California district court entered several rulings affecting both substantive and procedural matters.  Initially, Defendants BML, eBay, and PayPal moved to dismiss Plaintiff's California state law claims as foreclosed by the Utah choice-of-law clause, preempted by federal banking laws (which independently mandate the application of Utah law), and simply not viable under California law.  (Docket Nos. 2-6, 2-10, and 3-14.)  On December 12, 2010, the Court granted the motions in part, dismissing Plaintiff's usury claim with prejudice because Utah has a greater interest than California in applying its law to the interest rate set forth in the loan agreement.  (Docket No. 5-6 at 8-10.)

## **LEGAL STANDARD**

On a Rule 12(b)(6) motion, the court need not accept as true "[m]ere legal conclusions," *GFF Corp. v. Assoc. Wholesale Grocers, Inc.,* 130 F.3d 1381, 1385 (10th Cir. 1997), or conclusory allegations unsupported by facts.  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1950 (2009).  Moreover, factual allegations that contradict documents relied upon by the complaint or matters subject to judicial notice "are not well-pleaded facts that the court must accept as true."  *GFF Corp.*, 130 F.3d at 1385.  Here, after setting aside the rhetoric and irrelevant allegations, the FAC cannot support a verdict for Plaintiff in light of the admitted facts and the documents Plaintiff has relied upon in this litigation, and thus should be dismissed with prejudice.

**ARGUMENT**

I.   **PLAINTIFF'S CALIFORNIA CLAIMS FAIL BECAUSE HE IS BOUND BY A UTAH CHOICE-OF-LAW CLAUSE AND BECAUSE, EVEN UNDER CALIFORNIA LAW, HIS CLAIMS FAIL AS A MATTER OF LAW.**

All of Plaintiff's claims – except his CLRA claim – should be dismissed because the contract he accepted contains a valid and enforceable Utah choice-of-law clause.  His CLRA claim fails as a matter of California law, however, as do many of his other state law claims. Therefore, the Court can and should dismiss the FAC purely on state law grounds.

A.   **The Utah Choice-Of-Law Clause Disposes of Plaintiff's Usury, Late Fee, and UCL Claims.**

It is undisputed that Plaintiff entered into an account agreement that contains a choice-of-law provision that selects Utah law.  For the following reasons, the Court should enforce that provision against all of Plaintiff's claims except the claim under the CLRA.

1.   **Under the Restatement, Which Utah and California Follow, the Utah Choice-Of-Law Clause Is Presumptively Valid.**

Utah and California apply the same choice-of-law rules to disputes governed by contractual choice-of-law clauses.[3]   Both follow the Restatement (Second) of Conflicts of Law. *Nedlloyd Lines B.V. v. Super. Ct.,* 3 Cal. 4th 459, 464-65 (1992); *Am. Nat'l Fire Ins. Co. v. Farmers Ins. Exch.,* 927 P.2d 186, 190-91 (Utah 1996); *Chevron Pipe Line Co. v. Pointe Perry, L.C.,* No. 08-981, 2011 U.S. Dist. LEXIS 112092, at *3-4, *9-10 & n.1 (D. Utah Sept. 29, 2011) (unpublished).  Section 187 of the Restatement reflects a strong policy favoring enforcement of choice-of-law clauses.  *ABF Capital Corp. v. Osley,* 414 F.3d 1061, 1066 (9th Cir. 2005).  Under Section 187, this choice-of-law clause is presumptively valid for two independent reasons:  the transaction has a "substantial relationship" to Utah, and a "reasonable basis" existed for selecting

---

[3] For this reason, this brief cites California and Utah decisions interchangeably.

Utah law.  *Nedlloyd,* 3 Cal. 4th at  464-65; *Prows v. Pinpoint Retail Systems, Inc.,* 868 P.2d 809, 811 (Utah 1993) (*citing* Rest. (Second) of Conflict of Laws § 187(2) (Supp. 1988)).

First, Utah has a "substantial relationship" to the parties and the transaction because CIT Bank is and was chartered in Utah, was a party to the contract, and funded the loan.  (FAC ¶ 6; Docket No. 3-17 at 5, 6, 8 n.7; Docket No. 5-6 at 6) (Plaintiff "acknowledges that CIT funded his loan . . . [and] concedes that CIT is chartered in Utah"); Brown Decl., Ex. B.)  WebBank, like CIT Bank, is also a Utah bank, and now owns Plaintiff's account.  (FAC ¶¶ 6, ███████; Brown Decl., Ex. D at 10.)  This more than suffices for choice-of-law purposes.  *Nedlloyd,* 3 Cal. 4th at 467 (holding "substantial relationship" exists if party to contract resides in forum); *Ventura v. 1st Fin. Bank USA,* No. 03-4515, 2005 WL 2406029, at *5 (N.D. Cal. Sept. 29, 2005) (unpublished) (location of bank created "substantial relationship"); *Ury v. Jewelers Acceptance Corp.,* 227 Cal. App. 2d 11, 16-18 (1964) (place where loan contract accepted established "substantial relationship"); Rest. (Second ) of Conflict of Laws § 187 cmt. f (substantial relationship exists if the state whose law is selected is the place of contracting, place of performance, domicile of a party, or location of the events giving rise to the action).

Second, a "reasonable basis" existed for selecting Utah law because it is reasonable to select the law of a state where a party to the contract resides.  *Nedlloyd,* 3 Cal. 4th at 467; *Hughes Elecs. Corp. v. Citibank Del.,* 120 Cal. App. 4th 251, 258 (2004); *accord McBride v. Market Street Mortg.,* 381 Fed. Appx. 758, 765-66 (10th Cir. 2010) (location of corporate headquarters provided reasonable basis for choice of law).  That is particularly true where, as here, Defendants offer the program nationwide over the Internet, through thousands of merchants.  (FAC ¶¶ 4, 47.)  In this setting, it is critical that courts "honor the parties' choice of law . . . to make it possible for them to foretell with accuracy what will be their rights and

8

liabilities'" when dealing with consumers nationwide. *See Boyd Rosene & Assoc's v. Kansas Mun. Gas Agency,* 174 F.3d 1115, 1121 (10th Cir. 1999); *CQL Original Prods., Inc. v. Nat'l Hockey League Players Ass'n,* 39 Cal. App. 4th 1347, 1355 (1995).

Because the Utah choice-of-law clause is presumptively valid, under Restatement Section 187, Plaintiff must establish for each of his California state law claims both that: (1) applying Utah law would violate "a fundamental policy" of California and (2) California "has a materially greater interest than" Utah in applying its law. *King v. PA Consulting Group, Inc.,* 485 F.3d 577, 585 (10th Cir. 2007) (summarizing Restatement (Second) § 187); *accord Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1188 (9th Cir. 2001) ("this conflicts test must be applied to *each* claim"); *Nedlloyd,* 3 Cal. 4th at 466-67. "The mere fact that [Utah] law provides greater or lesser protection than California law, or that in a particular application [Utah] law would not provide protection while California law would, are not reasons for applying California law." *Medimatch, Inc. v. Lucent Techs. Inc.,* 120 F. Supp. 2d 842, 862 (N.D. Cal. 2000).

Here, Plaintiff cannot establish that enforcing Utah law would violate a fundamental California public policy with respect to usury, late fees, or the UCL, or that California has a materially greater interest than Utah in applying its law to this dispute. Indeed, even ignoring the Utah choice-of-law clause, Utah has a greater interest than California in this dispute, and Plaintiff's claims fail for this reason as well.

### 2. Plaintiff Cannot Overcome the Utah Choice-of-Law Clause Because California Lacks a Fundamental Public Policy as to Usury, Late Fee, and UCL Claims.

California does not have a fundamental public policy with respect to (a) usury, (b) late fees, or (c) the UCL. As a result, the Court can dismiss these California claims without needing to weigh the respective interests of Utah and California.

9

### a)      Enforcing a 19.9% interest rate under Utah law would not violate a fundamental public policy of California's usury law.

California's usury law does not constitute a "fundamental" public policy for choice-of-law purposes, and certainly does not where, as here, the challenged rate is only 19.9%.

The California Constitution generally sets 10% as the maximum interest rate for consumer loans.  Cal. Const. art. XV, § 1(1).  It contains multiple exceptions, and authorizes the California legislature to create additional ones.  *Id.* at § 1(2).  Over the years, California's usury law has become "riddled with so many exceptions that the law's application itself seems to be the exception rather than the rule."  *Jones v. Wells Fargo Bank,* 112 Cal. App. 4th 1527, 1534-35 (2003) (quoting *Ghirardo v. Antonioli,* 8 Cal. 4th 791, 807 (1994)).[4]

In light of this history, California courts repeatedly have enforced choice-of-law clauses in usury cases where, as here, the applicable interest rate was not exorbitantly in excess of 10%. *Sarlot-Kantarjian v. First Penn. Mortg. Trust,* 599 F.2d 915, 918 (9th Cir. 1979) (enforcing Massachusetts choice-of-law clause although it meant accepting interest rates over 13.4-18%); *Petters Co. v. BLS Sales, Inc.,* No. 04-2160, 2005 WL 2072109, at *4 (N.D. Cal. Aug. 26, 2005) (unpublished) (36%); *Gamer v. duPont Glore Forgan, Inc.,* 65 Cal. App. 3d 280, 287-90 (1976) (30%); *Ury*, 227 Cal. App. 2d at 21 (20.3%).  The rationale underlying these decisions is simple. The existence of so many exceptions to California's usury law reveals a lack of a "strong public policy against any and all contracts which would be usurious."  *Ury,* 227 Cal. App. 2d at 20.  "A strong public policy . . . would not be" subject to exceptions "the Legislature might choose to impose" or create.  *Id.*

---

[4]  *E.g.,* Cal. Civ. Code §§ 1917.005, 1917.619; Cal. Corp. Code § 25116; Cal. Fin. Code §§ 1675, 1768, 7675; Cal. Gov't Code § 5906; *Sw. Concrete Prods. v. Gosh Constr. Corp.,* 51 Cal. 3d 701 (1990) (recognizing time-price doctrine, which exempts credit sales from usury laws).

10

Because California lacks a fundamental public policy against 19.99% interest rates,

Plaintiff asks this Court to treat late fees as finance charges to inflate the interest rate on his

account above 70%.  (FAC ¶¶ 103-04.)  Late fees are not regulated under California usury law,

however, because they do not constitute payment for the loan or forbearance of any money.

*Southwest Concrete Prods. v. Gosh Constr. Corp.,* 51 Cal. 3d 701, 709 (1990).  Plaintiff's usury

claim therefore must be dismissed.

> **b)      Upholding the program late fees under Utah law would not violate a fundamental California public policy regarding late fees.**

California also does not have a fundamental public policy to apply Subsections 1671(c)-

(d) of its Civil Code to the exclusion of Utah law in disputes over late fees.

First, Section 1671, like the usury provision, is subject to numerous exceptions.  Its

general terms do not apply when "another statute" sets the late fees permitted for a contract.  Cal.

Civ. Code § 1671(a); *see infra* Section I.B.2.b (explaining why this exception defeats Plaintiff's

claim even ignoring the Utah choice-of-law clause).  The California Legislature has enacted

"numerous exceptions" (at least twenty-four).[5]  For example, Section 1671 does not apply when

federal statutes provide for late fees.  Cal. Civ. Code § 1671 (cmt. to 1977 amendment).  Even

---

[5] *See, e.g.,* Cal. Bus. & Prof. Code §§ 10242.5 (real estate loans), 11265.1(a)(2) (time-share assessments), 21713.5 (rental facility contracts); Cal. Civ. Code §§ 1675-1681 (real property purchase contracts); 1803.6 (retail installment sales contracts), 1812.626 (rental-purchase contracts), 2954.4 (loan secured by mortgage or deed for single-family, owner-occupied dwelling), 2982 (automobile sales contract); Cal. Com. Code § 2718 (sales transactions); Cal. Educ. Code § 92050 (University of California construction contracts); Cal. Fin. Code §§ 4001(a) (credit and charge card agreements), 18249, 18250, 18631 (finance agreements), 22002 (licensed finance lenders); Cal. Food & Agric. §§ 55881 (farm product contracts), 56620 (same); Cal. Gov't Code §§ 14376 (state public works contracts), 53069.85 (local public project cotracts), 53088.7 (cable television contracts); 54348 (utilities or other local agency enterprise contracts); Cal. Pub. Cont. Code § 10826 (California State University construction contracts); Cal. Pub. Res. Code § 6224 (State Lands Commission leases or agreements); Cal. Sts. & High. Code §§ 5254.5 (Improvement Act of 1911), 10503.1 (Municipal Improvement Act of 1913).

11

when Section 1671 does apply, it does not foreclose all late fees, but treats them either as presumptively "valid" (Section 1671(b)) or, for certain types of retail purchases, permissible where it is "impracticable or extremely difficult to fix the actual damage" (Section 1671(c)-(d)). These exceptions and qualifications make it at best "questionable" for plaintiff to argue that Section 1671 embodies a fundamental California policy regulating late fees. *See Ury,* 227 Cal. App. 2d at 20.

Second, Utah law could not offend California because no serious conflict exists between California and Utah concerning late fees. California and Utah share the same general standard for determining the validity of liquidated damages provisions. *Util. Consumers' Action Network, Inc. v. AT&T Broadband of S. Cal., Inc.,* 37 Cal. Rptr. 3d 827, 832 (Ct. App. 2006); *Woodhaven Apartments v. Washington,* 942 P.2d 918, 920 (Utah 1997). California and Utah also agree that that general standard must give way where the legislature adopts different standards for a particular setting, which is precisely what Utah has done for consumer credit agreements in the Utah Consumer Credit Code. Cal. Civ. Code § 1671(a); Utah Code § 70C-2-102.

For each of these reasons, applying Utah law to determine the validity of the late fees could not contravene a fundamental public policy of California. The Utah choice-of-law clause thus should be enforced, and Plaintiff's claims under Subsection 1671(c)-(d) dismissed with prejudice.

<strong>c)     The UCL is not a fundamental California public policy.</strong>

Third, and finally, the UCL does not represent a fundamental California public policy for choice-of-law purposes. *Net2Phone v. Super. Ct.,* 109 Cal. App. 4th 583 (2003) (enforcing forum selection clause even though doing so also would result in dismissal of UCL claim). The UCL does not bar parties from agreeing by contract to resolve disputes under the laws of another state or to waive rights under the UCL. That is why "[a] valid choice-of-law provision selecting

12

another state's law is grounds to dismiss a claim under California's UCL." *Melt Franchising, LLC v. PMI Enters., Inc.,* No. 08-4148, 2009 WL 32587, at *2 (C.D. Cal. Jan. 2, 2009) (unpublished) (citing *Continental Airlines,* 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006)).  Any interest California may have in seeing UCL claims brought is satisfied where, as here, the chosen forum also has a public policy to protect consumers against unfair business practices.  *Huff v. Liberty League Int'l, LLC,* No. 08-1010, 2009 WL 1033788, at *6 (C.D. Cal. Apr. 14, 2009) (unpublished) (enforcing Arizona choice-of-law clause where Arizona had a public policy to protect consumers against unfair business practices); Utah Code § 13-2-1 *et seq.* (Utah Unfair Practices Act); § 13-11-1 *et seq.* (Utah Consumer Sales Practices Act); § 13-11a-1 (Utah Truth in Advertising law).  The UCL claim thus should be dismissed.

### 3. California Does Not Have a Materially Greater Interest than Utah in Applying its Laws to Plaintiff's Usury, Late Fee, and UCL Claims.

Even assuming California's usury, late fee, or UCL could represent a fundamental California public policy for choice-of-law purposes, Plaintiff still cannot avoid Utah law because California does not have a materially greater interest than Utah in applying its law to his claims.

First, "Utah has a very strong interest in protecting the rights of its citizens to contract freely."  (Docket No. 5-6 at 8:18-19.)  Under Utah law, parties "are entitled to contract on their own terms" (*Bekins Bar V Ranch v. Huth,* 664 P.2d 455, 459 (Utah 1983)), and courts will not relieve a party "from the effects of a bad bargain" (*id.*) on the ground that a contract "actually may be unreasonable or . . . may lead to hardship on one side." *Carlson v. Hamilton,* 332 P.2d 989, 991 (Utah 1958).  The strength of Utah's interest in respecting contractual freedom alone outweighs California's diffuse interest in prohibiting, in some circumstances, interest rates in excess of 10%.

13

Second, Utah is the place where the contract was entered into, and where the bank is located that funded the loan by advancing the funds to the third-party merchant. (FAC ¶¶ 6, 8, 34, 36; Brown Decl., Ex. B at 10.)  Such factors give Utah the materially greater interest. *See Abat v. Chase Bank USA, N.A.,* 738 F. Supp. 2d 1093, 1095-96 (C.D. Cal. 2010) (enforcing choice-of-law clause selecting home state of bank); *Ventura,* 2005 WL 2406029, at *5 (holding bank's home state had materially greater interest than California even though selected law was "arguably . . . contrary" to fundamental policy).

Third, Utah's Legislature has expressed a direct interest specifically in the late fees that apply to consumer lending programs by adopting a statute – the Utah Consumer Credit Code ("UCCC") – designed to govern this very type of consumer credit agreement.  Utah Code § 70C-1-101 *et seq.*  Utah requires, moreover, that the UCCC "be liberally construed and applied," and lists among its purposes protecting lenders from duplicative state laws.  Utah Code § 70C-2-102.

Fourth, California itself has a strong public policy in favor of enforcing choice-of-law clauses, *Nedlloyd,* 3 Cal. 4th at 462, including where businesses operate nationwide. *CQL Original Products,* 39 Cal. App. 4th at 1355.  California's Legislature has also adopted a statutory choice-of-law rule requiring contracts to be interpreted according to the laws of the state where performed or made, which further supports the enforcement of the Utah choice-of-law clause here.  Cal. Civ. Code § 1646.

To be sure, Plaintiff will argue that "California has an interest in protecting the rights of its resident." *Ventura,* 2005 WL 2406029, at *5.  Even on the face of the FAC, it is clear that most participants in the challenged program are unaffected by these claims, because "most pay on time and in full," thus never incurring interest or late fees.  (FAC ¶ 103.)  But whatever interest California has in protecting the residents affected here would exist in every case.  And it

14

is matched by Utah's "equal interest in protecting the rights of its resident businesses." *Ventura,* 2005 WL 2406029, at \*5.  That is why Section 187 requires Plaintiff to establish that California has a *materially greater* interest than Utah, not merely any interest or potentially a greater interest.  Otherwise, no choice-of-law clause could be enforced.

For all of these reasons, Plaintiff cannot carry his burden of establishing that California has a materially greater interest than Utah with respect to usury, late fees, or the UCL.  Indeed, California's UCL does not speak to permissible interest rates or late fees – the two issues at the heart of this case.  The Court therefore should dismiss Plaintiff's UCL claims and his other claims predicated on California's laws regarding usury or late fees.

### 4.      Utah Law Applies Under General Choice-of-Law Principles, Regardless of the Utah Choice-of-Law Clause.

Though not necessary in light of the existence of a valid Utah choice-of-law clause, the Court could separately dismiss Plaintiff's California usury, late fee, and UCL claims under a straight choice-of-law analysis under Section 188 of the Restatement.  *See Kearney v. Salomon Smith Barney, Inc.,* 39 Cal. 4th 95, 107 (2006); *Application Grp., Inc. v. Hunter Grp., Inc.,* 72 Cal. Rptr. 2d 73, 82 (Ct. App. 1998) (citing *S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.,* 641 F.2d 746, 749 (9th Cir. 1981)); *Basic Research v. Bdirect,* No. 06-932, 2007 U.S. Dist. LEXIS 91705, at \*12 (D. Utah Dec. 13, 2007) (unpublished) (citing Section 188 of the Restatement and *Mountain Fuel Supply v. Reliance Ins. Co.,* 933 F.2d 882 (10th Cir. 1991)).  Under Section 188, the law of the state with the greater interest applies, and in determining that interest, the Court would weigh all the factors discussed above.  As shown, Utah has a greater interest in enforcing its laws in this dispute.

15

**B.      Even Under California Law, Plaintiff Cannot Pursue CLRA, Late Fee, UCL, and Aiding and Abetting Claims as a Matter of Law.**

Independent of choice-of-law issues, the Court can and should dismiss Plaintiff's CLRA, late fee, UCL, and aiding and abetting claims even assuming California law could apply here because Plaintiff fails to state viable claims as a matter of California law.

### 1.      The CLRA Does Not Apply to Extensions of Credit.

Plaintiff has acknowledged that the CLRA does not apply generally to extensions of credit, but has contended that the CLRA does cover a species of credit that he has dubbed "transactional credit."  (FAC ¶ 47; Docket No. 3-19 at 18-19.)  As invoked here, this exception is squarely foreclosed by California law.

Courts have considered whether the CLRA applies to extensions of credit made for specific purchases and concluded that the CLRA does not apply *unless* "the seller of the goods or services happens to be the one extending credit . . . ."  *Van Slyke v. Capital One Bank,* 503 F. Supp. 2d 1353, 1359 (N.D. Cal. 2007).  Courts have refused to extend this exception to transactions when an entity *other* than the seller extends the credit, including in settings ranging from credit card purchases (*id.* at 1359; *Augustine v. FIA Card Servs., N.A.,* 485 F. Supp. 2d 1172, 1175 (E.D. Cal. 2007)) and debit card purchases (*Gutierrez v. Wells Fargo & Co.,* 622 F. Supp. 2d 946, 956-57 (N.D. Cal. 2009)) to student loans (*Bottoni v. Sallie Mae, Inc.,* No. 10-3602, 2011 U.S. Dist. LEXIS 18874, at *31-32 (N.D. Cal. Feb. 11, 2011) (unpublished)), mortgages (*Reynoso v. Paul Fin., LLC,* No. 09-3225, 2009 WL 3833298, at *9 (N.D. Cal. Nov. 16, 1999) (unpublished)), and check overdraft extensions (*In re Checking Account Overdraft Litig.,* 694 F. Supp. 2d 1302, 1326-27 (S.D. Fla. 2010) (evaluating California law)).

16

Those and other decisions have dismissed CLRA claims despite allegations that late fees and charges were incurred as a result of credit extended for a specific purchase or transaction.[6]

The California Supreme Court also has rejected the reasoning underpinning Plaintiff's "transactional credit" theory. *See Fairbanks v. Super. Ct.,* 46 Cal. 4th 56, 61-62, 65 (2009). In *Fairbanks,* the plaintiff argued that even if insurance – like an extension of credit – is not a "good" or "service" covered by the CLRA, insurers invariably provide related services that should be covered by the CLRA. *Id.* The Court rejected this argument, holding that neither life insurance, nor the ancillary services associated with it, fall within the CLRA. *Id.* The Court recognized that accepting the plaintiff's reasoning would effectively destroy the express limitations on the scope of the CLRA, and "defeat the apparent legislative intent in limiting the" CLRA's scope:

> [A]ncillary services are provided by the sellers of virtually all intangible goods – investment securities, bank deposit accounts and *loans*, and so forth. The sellers of virtually all these intangible items *assist prospective customers in selecting products that suit their needs,* and they often provide additional customer services related to the maintenance, value, use, redemption, resale, or *repayment* of the intangible item.

*Id.* at 65 (emphasis added). Given the Legislature's decision to exclude terms such as "money" and "credit" from the CLRA, the Court held that an expansive reading of the CLRA that would sweep in those who provide services to assist with the "repayment" of "loans" is untenable. *See id.* at 62, 65; *see also Berry v. Am. Express Publ'g,,* 147 Cal. App. 4th 224, 230 (2007).

---

[6] *Gutierrez,* 622 F. Supp. 2d at 956-57 (debit card overdraft fees); *Young v. Wells Fargo & Co.,* 671 F. Supp. 2d 1006, 1026 (S.D. Iowa 2009) (mortgage servicing fees); *Van Slyke,* 503 F. Supp. 2d at 1359 (credit card fees); *In re Late Fee & Over-Limit Fee Litig.,* 528 F. Supp. 2d 953, 966 (N.D. Cal. 2007) ( credit card fees); *In re Checking Account Overdraft Litig.,* 694 F. Supp. 2d at 1326-17 (check overdraft fees).

17

*Fairbanks* shows that the California Supreme Court views services related to intangible items (like loans) as outside of the CLRA's reach.  It also effectively overrules the few cases Plaintiff previously offered for his "transactional credit" exception, all of which arose in the mortgage context.  (Docket No. 3-19 at 17-18 & n.24.)  "Since *Fairbanks*, courts have held that the CLRA is inapplicable to mortgage loans and the ancillary services related to them." *Palestini v. Homecomings Fin.,* LLC, No. 10-1049, 2010 WL 3339459, at *11 (S.D. Cal. Aug. 23, 2010) (unpublished).  In fact, at least ten district courts in California have done so.  *Id*.[7]

Here, Plaintiff is not challenging finance charges and late fees associated with an extension of credit made by the retailer who sold him his computer.  He is not alleging that the computer he purchased from a third-party (Cyberpower Inc.) using his account was defective or falsely promoted.  (*See* FAC ¶¶ 34-46, 120-23.)  His CLRA claim thus relates "only [to] the validity" of the agreement under which he was extended credit, and it is undisputed that Cyberpower, Inc. did not extend the credit.  *Consumer Solutions,* 658 F. Supp. 2d. at 1017; *Ball v. Fleet Boston Fin. Corp.,* 164 Cal. App. 4th 794, 798 (2008) ("Whatever [plaintiff] intended to do with her credit card, the act of extending credit alone is not covered by the

---

[7] *Becker v. Wells Fargo Bank, N.A.,* No. 10-2799, slip op. at 35 (E.D. Cal. March 22, 2011) (rejecting pre-Fairbanks CLRA mortgage cases) (available at Docket No. 15-4); *Young,* 671 F. Supp. 2d at 1026 (same); *Wilcox v. EMC Mortg. Corp.,* No. 10-1923, slip op. at 10 (C.D. Cal. July 25, 2011) (CLRA not applicable to "an extension of credit, such as a mortgage loan") (available at Docket No. 15-3); *Sonoda v. Amerisave Mortg. Corp.,*  No. 11-1803, 2011 WL 2690451, at *4 (N.D. Cal. July 8, 2011) (unpublished) (same); *Oatway v. Option One Mortg. Corp.,* No. 10-8188, slip op. at 5-6 (C.D. Cal. March 2, 2011) (same) (available at Docket No. 15-5); *Dunn v. GMAC Mortg., LLC,* No. 10-3196, 2011 WL 1230211, at *4 (E.D. Cal. March 28, 2011) (unpublished) (same); *Perlas v. Mortg. Elec. Registration Sys., Inc.,* No. 09-4500, 2010 WL 3079262, at *5 (N.D. Cal. Aug. 6, 2010) (unpublished) (same); *Justo v. IndyMac Bancorp,* No. 09-1116. 2010 WL 623715, at *3-4 (C.D. Cal. Feb. 19, 2010) (unpublished) (same); *Reynoso v. Paul Fin., LLC,* No. 09-3225, 2009 WL 3833298, at *9 (N.D. Cal. Nov. 16, 2009) (unpublished) (same); *Consumer Solutions Reo, LLC, v. Hillery,* 658 F. Supp. 2d 1002, 1016-17 (N.D. Cal. 2009) (same).

CLRA"). If the Legislature's decision to exclude "money" and "credit" from the CLRA is to have any significance, then the use of credit to purchase a consumer good – a necessary and ancillary consequence of almost every consumer credit transaction – is not and cannot be enough to invoke the CLRA. *See Fairbanks,* 46 Cal. 4th at 61-62, 65. As a result, the Court should dismiss Plaintiff's CLRA claim with prejudice.

### 2. California Civil Code Subsections 1671(c)-(d) Do Not Apply to Extensions of Credit or When Another Statute Governs Late Fees.

Plaintiff also may not bring claims that the late fees on his loan violate California Civil Code subsections 1671(c)-(d) because those subsections, like the CLRA, also do not apply to extensions of credit. They also do not apply when another, more specific law such as the UCCA applies.

### a) Subsections 1671(c)-(d) do not apply to extensions of credit.

A California district court recently considered whether subsections 1671(c)-(d) apply to extensions of credit to purchase goods or services, and squarely held they do not. *Bottoni v. Sallie Mae, Inc.,* No. 10-03602, 2011 U.S. Dist. LEXIS 18874, at *25-27 (N.D. Cal. Feb. 11, 2011) (Order Granting in Part and Denying in Part Defendants' Motion to Dismiss First Amended Complaint) (unpublished) ("*Bottoni I*"); *Bottoni v. Sallie Mae, Inc.,* No. 10-3602, 2011 U.S. Dist. LEXIS 61626, at *10-13 (N.D. Cal. June 8, 2011) (Order Granting in Part and Denying in Part Defendants' Motion to Dismiss Second Amended Complaint ) (unpublished) ("*Bottoni II*"). The court cited three reasons:

First, subsections 1671(c)-(d) do not to purport to apply to credit transactions. Rather, subsection 1671(d) requires a violation of subsection 1671(c), and subsection 1671(c) applies only to a contract "for the *retail purchase*, or rental, by such party of *personal property or services*, primarily for the party's personal, family, or household purposes . . . ." Cal. Civ. Code

19

§ 1671(c) (emphasis added).  An extension of credit "does not fit within an easy understanding of a contract for [a] 'retail purchase' . . . ." *Bottoni II,* 2011 U.S. Dist. LEXIS 61626, at *11.  "Treating the borrowed money as a purchased object basically turns a loan into a retail installment sale/contract for money" (*Bottoni II,* 2011 U.S. Dist. LEXIS 61626, at *12), and the Legislature exempted such agreements from Section 1671 (Cal. Civ. Code §§ 1671(a), 1803.6).

Second, extensions of credit do not fit within the ordinary meaning of "services" or "rental  . . . of personal property."  *Bottoni II*, 2011 U.S. Dist. LEXIS 61626, at *11-12.  Credit is not a "service" and does not become a "service" whenever accompanied by "ancillary services."  *Id.* at *10.  Citing reasoning in the California Supreme Court's decision in *Fairbanks*, the court held that "ancillary" tasks "*do not change an extension of credit into a service* under Section 1671(c)."  *Id.* at *10 (emphasis added).  Otherwise, every extension of credit could be pled as subject to subsections 1671(c)-(d), effectively defeating the inherent limitations built into the statute.

Third, and finally, *Bottoni* pointed out that the California Supreme Court has "address[ed] liquidated damages provisions contained within loan documents" under Section 1671(b), which treats such clauses as presumptively *valid,* instead of subsections 1671(c)-(d), which do not.  *Id.* at *11 (citing *Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal. 4th 970, 977 (1998); *In re Hein*, 60 B.R. 769, 777-78 (S.D. Cal. 1986)).  It acknowledged that an earlier intermediate California court had applied subsection 1671(c)-(d) in a dispute relating to a credit card account, but declined to follow that decision, including because that court did not hold that an extension of credit is a service and, under *Fairbanks,* the provision of "ancillary" services in connection with an extension of credit "do[es] not change an extension of credit into a service."  *Id.* at *10 (distinguishing *Hitz v. First Interstate Bank,* 38 Cal. App. 4th 274, 44 Cal. Rptr. 2d 890 (1995)).

20

Consequently, *Bottoni* provides a state law basis, independent of choice-of-law, to dispose of all of Plaintiff's California late fee claims.

> **b)      Section 1671 does not apply where another statute authorizes late fees.**

Plaintiff's late fee claims predicated on subsections 1671(c)-(d) also ignore that Section 1671 begins with an important limitation. Section 1671 as a whole "does not apply in any case where *another statute expressly applicable to the contract prescribes the rules or standard* for determining the validity of a provision in the contract liquidating the damages for the breach of the contract." Cal. Civ. Code § 1671(a) (emphasis added).[8]

Here, the UCCC plainly is a "statute expressly applicable to the contract [that] prescribes the rules or standard for determining the validity of a provision in the contract liquidating the damages for breach of the contract." The UCCC expressly applies to late fees charged in connection with consumer credit agreements made in Utah. Utah Code § 70C-2-102. The UCCC is "liberally construed and applied" (*id.* at § 70C-1-102), specifically to "*credit offered or extended by a creditor to an individual person* primarily for personal, family, or household purposes" (*id.* at § 70C-1-201 (emphasis added)). It also specifically defines a "creditor" as a person "to whom the obligation is initially payable . . . on *the face of the note or contract. . . .*" *Id.* at § 70C-1-302(3)(a)(i) & 302(7) (emphasis added).

The admitted facts here trigger the application of the UCCC. "Plaintiff does not dispute that CIT is a party to the Agreement," that "CIT funded his loan and advanced the funds to the merchant," that "CIT is charte[r]ed in Utah," and that CIT Bank and now WebBank own his account. (Docket No. 5-6 at 6; *accord* Brown Decl., Ex. A ¶¶ 1, 12, 44, 49, 50); FAC ¶¶ 6, 15,

---

[8] Section 1671 is not limited to California statutes, as evidenced by its plain language and the statutory comments. *See id.* (cmt. to 1977 amendment, citing examples of federal statutes).

■; Docket No. 41 at 2.)   The agreement also recites on its face that it "has been accepted by you in the state of Utah, and all loans will be extended by you in the state of Utah."  (Brown Decl., Ex. B at 10; *see also* Docket No. 5-8 ¶¶ 1, 12, 41, 46, 47; Docket No. 5-6 at 2; Cal. Evid. Code § 622 ("facts recited in a written instrument are conclusively presumed to be true as between the parties").  CIT Bank – and by assignment WebBank – is therefore the "creditor" under the agreement who offered or extended credit to Plaintiff.  Utah Code §§ 70C-1-201, 70C-1-302(3)(a)(i) & 302(7).

For this independent reason as well, the Court can dismiss all claims predicated on the assumption that subsections 1671(c)-(d) control the validity of late fee charges.

### 3.  Plaintiff Has Not Alleged Viable UCL Violations.

Plaintiff's claims under the UCL also must fail.  The UCL creates a private right of action for those who lose money or property "as a result" of "unlawful," fraudulent, or "unfair" business practices.  Cal. Bus. & Prof. Code §§ 17200, 17208.  Violation of another state or federal law can serve as a predicate for a UCL claim.  *Bardin v. DaimlerChrysler Corp.,* 136 Cal. App. 4th 1255, 165-66 (2006).  Because prior sections already demonstrate that Plaintiff cannot pursue UCL claims predicated on usury (FAC ¶¶ 137, 139, 141), on late fees violating subsections 1671(c)-(d) (*id.* ¶¶ 126-128), or on the CLRA (*id.* ¶ 129), this section focuses on Plaintiff's final efforts to identify a predicate violation for a UCL claim – namely, purported violations of California's Finance Lenders Law ("FLL") or more generally of public policy.  (*Id.* ¶¶ 130-131, 133-136.)

The FLL requires that persons obtain a license to "engage in the business of a finance lender or broker" and sets out various regulations for licensees.  Cal. Fin. Code § 22100 *et seq.* Plaintiff alleges that Defendant BML was subject to the FLL and was required, but failed, to file an annual report with the California commissioner (FAC ¶ 133; Cal. Fin. Code § 12304),

disclose certain information in a license application (FAC ¶ 135; Cal. Fin. Code § 22109), and provide evidence to the commissioner that no one with more than a 10% interest in "the lender" has been convicted of a crime or committed fraud. (*Id.*)

The FLL-based UCL claims fail because the FLL "does not apply to any person doing business under any law of *any state* or of the United States relating to banks." Cal. Fin. Code § 22050; *accord Wells Fargo Bank N.A. v. Boutris,* 419 F.3d 949, 965 (9th Cir. 2005). The extensions of credit at issue here were made under the banking laws of Utah, both due to the express terms of the contract and because CIT Bank funded the loan from Utah, owned the account before assigning it to WebBank, and CIT Bank was based in Utah and subject to the UCCA. This alone precludes any claims under the FLL.

The UCL claim also fails to the extent it is based on Plaintiff's open-ended allegation that Defendants' conduct offends public policy. (FAC ¶ 132.) The UCL does not empower Plaintiff to invalidate contract terms as unfair, let alone disrupt a comprehensive regulatory regime, based on his personal policy preferences. *See Alvarado v. Selma Convalescent Hosp.,* 153 Cal. App. 4th 1292, 1298 (2007); *People ex rel. Dep't of Transp. v. Naegele Outdoor Adver. Co. of Cal.,* 38 Cal. 3d 509 (1985). There is nothing unfair, deceptive, or fraudulent about enforcing disclosed contract terms. *See Shvarts v. Budget Group, Inc.,* 81 Cal. App. 4th 1153, 1160 (2000) (affirming dismissal without leave to amend of 17200 claim because fees were disclosed). Defendants also had no duty enforceable under the UCL to advise Plaintiff about the legality of the program, because "[s]tatements of domestic law are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false." *Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 621 (9th Cir. 2004) (affirming Rule 12(b)(6) dismissal).

23

Consequently, even if the UCL could survive a choice-of-law analysis, Plaintiff lacks a viable UCL claim.

### 4.     Plaintiff Has Not Alleged Viable Aiding and Abetting Claims.

Finally, Plaintiff's aiding and abetting claim against eBay must fail because he has no viable California state law claims against Bill Me Later, the only entity eBay purportedly aided and abetted. *Coroles v. Sabey,* 79 P.3d 974, 993-94 (Utah Ct. App. 2003) (affirming dismissal of aiding and abetting predicated on fraud where court already had dismissed fraud claim).

## II.     FEDERAL LAW EXPRESSLY PREEMPTS PLAINTIFF'S CALIFORNIA CLAIMS BECAUSE THE LOAN WAS MADE BY A UTAH-CHARTERED, FEDERALLY INSURED BANK.

Plaintiff's claims predicated on California usury and late-fee laws are also preempted by federal law. CIT Bank and WebBank are state-chartered banks whose deposits are insured by the Federal Deposition Insurance Corporation (the "FDIC"). (FAC ¶¶ 2, 6) (admitting program is structured to rely on interest rate authority of FDIC-insured banks.) Section 27 of the Federal Deposit Insurance Act ("FDIA") authorizes these banks to establish periodic finance charges and late fees allowed by the laws of the state where the bank is located – Utah – without consideration of the state where the borrower resides. 12 U.S.C. § 1831d; *Greenwood Trust Co. v. Mass.,* 971 F.2d 818, 826 (1st Cir. 1992). Because Section 27 of the FDIA expressly preempts Plaintiff's California law claims, and because Plaintiff has pleaded no violations of federal or Utah usury law, the Court should dismiss the complaint.

### A.     Overview of FDIC Supervision of The Challenged Loan Program.

#### 1.     FDIC Supervision of Federally Insured Banks.

Banks, like CIT Bank and WebBank, are heavily regulated in all aspects of their business. As aptly summarized by one commenter, "The legal framework governing the U.S. banking industry consists of a multitude of statutory provisions implemented by an army of

24

regulators issuing myriad rules and regulations at the federal and state levels." Melanie L. Fein,

*Banking and Financial Services: Banking, Securities, and Insurance Regulatory Guide,* Vol I.

§ 3.01, at 3-5 (2006).  The extensive regulatory structure imposed under the FDIA is designed to

protect against bank failures that cause financial loss to the government insurance fund and,

more broadly, to ensure public confidence in our banking system.[9]   The FDIC is the primary

federal regulator of state-chartered, FDIC insured banks such as CIT Bank and WebBank, and as

such is charged with comprehensively reviewing both the banks' business operations and their

compliance with applicable legal requirements.  *Id.* § 3.03, at 3-6.

Banks, like CIT Bank and WebBank, also are periodically examined by the FDIC,

typically at least once every 12 months.  12 U.S.C. § 1820(b), (d); 12 C.F.R. § 337.12(a)-(c).[10]

FDIC examiners, who possess "thorough knowledge of Federal *and* State laws and regulations

pertinent to the bank being examined" (FDIC Risk Management Manual § 4.5, emphasis added),

evaluate not only "[c]ompliance with laws and regulations," but also the "adequacy of audits and

internal controls to . . . ensure compliance with laws, regulations, and internal policies" (*id*. at

§ 1.1).  The FDIC mandates that banks grant examiners "access to all records and employees of

the bank" to facilitate examinations.  *Id.*  The FDIC states that periodic examinations are "the

best means of determining the bank's adherence to laws and regulations."  FDIC Risk

Management Manual § 1.1.[11]  ██████████████████████████████████

████████████████████████████████████████████

---

[9] FDIC Risk Management Manual § 1.1, available at
www.fdic.gov/regulations/safety/manual/index.html.

[10] Utah-chartered banks, such as CIT Bank and WebBank, are also supervised by the Utah
Department of Financial Institutions ("UDFI").  *See* Utah Code § 7-1-314.

[11] In addition to the Risk Management Manual, which provides general guidance on
examinations, the FDIC has issued a Compliance Examination Manual focused on the part of

### 2.    FDIC Regulation Extends to Third Party Servicers and Bank Loan Programs Generally.

Federal banking law specifically contemplates that banks, like CIT Bank and WebBank, will enter into relationships with third parties to provide services in connection with their lending programs.  Congress has addressed such relationships not by prohibiting them, but by granting the FDIC the power to examine both the banks *and* the third parties who provide such services.  12 U.S.C. § 1867(c).  Section 1867 is entitled "Services performed by contract or otherwise" and provides, in pertinent part, that:

> whenever a depository institution that is regularly examined by an appropriate Federal banking agency, or any subsidiary or affiliate of such a depository institution that is subject to examination by that agency, *causes to be performed for itself, by contract or otherwise,* any services authorized under this chapter, whether on or off its premises—
>
> (1)    such performance shall be subject to regulation and examination by such agency *to the same extent as if such services were being performed by the depository institution itself on its own* premises, and
>
> (2)    the depository institution shall notify each such agency of the existence of the service relationship within thirty days after the making of such service contract or the performance of the service, whichever occurs first.

12 U.S.C. § 1867(c) (emphases added).[12]   Congress thus has recognized both that (a) a bank may arrange "by contract or otherwise" for a third party to perform loan program services and

---

examinations that address a bank's compliance with applicable laws, and a Credit Card Activities Manual that addresses open-end consumer credit programs like the Bill Me Later program. These can be found at: www.fdic.gov/regulations/compliance/manual/index_pdf.html and www.fdic.gov/regulations/examinations/credit_card.

[12] An FDIC-insured, state-chartered bank such as CIT Bank or WebBank is a "depository institution . . . regularly examined by an appropriate Federal banking agency. . . ."  *Id*.; 12 U.S.C. § 1813(a)(1)-(2), (c) (defining "depository institution" to include any national or state bank).

26

(b) if the bank does so, both the service and the third party are subject to FDIC's regulatory and supervisory authority to the same extent as if all of the services were performed by the bank itself.  *Id.*

The FDIC recognizes that, in some lending programs, banks will rely substantially on services provided through third parties, including third parties who also purchase loan receivables:

> The third party generally solicits prospective credit card customers and then provides approved applicants with a credit card.  The bank is identified as the issuer of the card while the . . . partner, and other sub-contracted participants may not necessarily be apparent to the cardholder . . . .  [T]he receivables are usually held by the . . . partner  . . . or another party.

FDIC Credit Card Activities Manual, Ch. XIV.

In these instances, the FDIC explains that "[w]hile the bank sheds itself of a majority of the day-to-day operational duties associated with operating the program in most cases, *it always retains ultimate responsibility for the program based on. . . it being the issuer of record."*  *Id.* (emphasis added).  The FDIC therefore directs examiners to "evaluate all applicable activities conducted through third-party relationships as though the activities were performed by the institution itself," concluding that third-party relationships "do not insulate the institution from its ultimate responsibility to conduct banking activities in a safe and sound manner and in compliance with applicable consumer protection laws. . . ."  Compliance Manual, § VII-5.7.  Thus, the FDIC regulates a bank's loan program (and not merely the bank) where the bank is the "issuer of record" and maintains the ongoing account relationship, like WebBank's here, as if the bank offered the program without the involvement of a third-party service provider or purchaser of receivables.

27

### 3.    Section 27 of the FDIA is an Integral Part of the Comprehensive Regulatory Structure For State Banks.

The FDIA – the same statute that governs the supervision and regulation of banks such as CIT Bank and WebBank by the FDIC – also governs the interest rates that state-chartered banks can charge their customers.  Section 27 of the FDIA provides:

> (a)    Interest rates. In order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates . . . such State bank[s] . . . may, **notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section** . . . charge on **any loan or other evidence of debt** . . . interest . . . **at the rate allowed by the laws of the State**, territory, or district **where the bank is located** . . . .

12 U.S.C. § 1831d(a) (emphasis added).

This interest rate authority is part and parcel of the regulatory structure governing state banks under the FDIA.  Section 27 was added to the FDIA in 1980, as Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), Pub. L. No. 96-221, 94 Stat. 132 (1980).  The late 1970s brought soaring interest rates as a result of a credit crunch, and state banks were particularly harmed because compliance with various "state usury laws . . . often made loans economically unfeasible. . . ."  *Greenwood Trust Co. v. Mass.,* 971 F.2d 818, 826 (1st Cir. 1992).  DIDA sought to alleviate this pressure on state banks (and, through similar provisions, other types of lenders, including savings banks, credit unions, and mortgage lenders[13]) by preempting state interest limits and allowing state banks (and other lenders) to charge appropriate interest rates.  126 Cong. Rec. 6900 (Mar. 27, 1980) (statement of Sen. Proxmire, discussing purpose of Title V of DIDA, including Section 27).  By expressly preempting state law, Section 27 was intended to promote lending by state chartered banks

---

[13] *See* 12 U.S.C. §§ 1463(g) (savings banks), 1735f-7 (mortgage lenders), 1785(g) (credit unions); each of these sections was added by DIDA.

during the credit crunch.  *Id.* at 6907 (statement of Sen. Bumpers, discussing intent to promote state banks' lending).  The FDIA also gives the FDIC general authority to supervise banks' safe and sound operations, 12 U.S.C. § 1818(b)(1), a broad authority that extends to all aspects of a bank's operations.  Under this authority, the FDIC has issued specific guidance on credit card programs.  *See* Credit Card Lending; Account Management and Loss Allowance Guidance, FIL-02-2003.[14]  This guidance governs, among other things, minimum payments on credit cards and workout programs.  It is but an illustration of the comprehensive FDIC regulation under the FDIA, of which Section 27 is also part.

> **B.**   **Section 27 Expressly Preempts Plaintiff's Claims.**
>
> **1.**   **The Plain Language of Section 27 Preempts Plaintiff's Claims.**

Congress "can preempt state statutes either by an express statement of preemption or by implication."  *Tarrant Reg'l Water Dist. v. Herrmann,* 656 F.3d 1222, 1241 (10th Cir. 2011).  "Express preemption arises from explicit preemption language in the statute."  *Id.*  If "[a] state law falls within the scope of [the] federal preemption provision," it must give way to federal law.  *Chamber of Commerce of United States v. Edmondson,* 594 F.3d 742, 765 (10th Cir. 2010).  In this instance, Section 27 authorizes state-chartered banks such as CIT Bank and WebBank to charge the interest rates and fees allowed by the laws of their home state, and *expressly* preempts any state law to the contrary.  12 U.S.C. § 1831d.  As a result, this Court's task is to interpret Section 27 of the FDIA and "identify the domain expressly pre-empted."  *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484 (1996).  Any state law "within the scope of [the] federal preemption provision" must give way.  *Edmondson,* 594 F.3d at 765.

---

[14] Available at http://www.fdic.gov/news/news/financial/2003/FIL0302a.html.

The language of Section 27 of the FDIA is straightforward and broad. It extends by its plain terms to "any loan" or "other evidence of debt." It also preempts "any State constitution or statute." When Congress uses the word "any," courts should construe the term to "mean[ ] what it says." *United States v. Gonzales,* 520 U.S. 1 (1997). Moreover, the breadth is underscored by the absence of any express exceptions to the scope of preemption. Nowhere does Section 27 restrict preemption to, *e.g.,* certain types of loans, to certain lending arrangements in which a state bank does not use the services of a third party, or to loans that a state bank does not sell. Rather, "any" state law that attempts to regulate the interest charges on "any" loan or other evidence of debt is expressly preempted. The scope of preemption extends not only to the rate of "interest" but also to late fees and other associated charges. *Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 746, 747 & 738 n.1 (1996); *Greenwood,* 971 F.2d at 827 (1st Cir. 1992); *accord* FDIC General Counsel's Op. 10, 63 Fed. Reg. 19258 (Apr. 17, 1998).

In *Hudson v. ACE Cash Express, Inc.,* No. 01-1336, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. May 30, 2002) (unpublished), the court held that the plain language of the federal banking statutes preempted similar state law claims. There, plaintiff similarly alleged that a bank played an "insignificant" role in a lending program that a non-bank had "designed for the sole purpose of circumventing Indiana usury law." *Id.* at *4. The court accepted these allegations as true, and still dismissed the plaintiff's complaint as preempted by 12 U.S.C. § 85 (the provision of the National Bank Act on which Section 27 was modeled). It rejected the very same analysis now advanced by Plaintiff, despite its "superficial appeal," because it would result in an "uncertain and unpredictable" regulatory regime:

> While [plaintiff] acknowledges the preemptive force of [federal law], she contends the statute should be construed so as not to apply to national bank loans made for the purpose of evading state usury laws, or to loans in which a national bank "rents" its charter to some other entity. The position has some superficial

30

appeal, but the court rejects it.  [Plaintiff] invites the courts to draw boundaries between federal and state bank regulation depending upon the subjective purpose of those engaged in the transaction and/or the precise extent of financial risk accepted by the national bank.  The court sees no basis for drawing jurisdictional boundaries in such an uncertain and unpredictable way, at least as a matter of statutory construction . . . .

*Id.* at \*16.  The court further reasoned that "protection of state usury laws" from federal preemption "is an issue of legislative policy, and any plea" to alter the scope of preemption "is better addressed to the wisdom of Congress than to the judgment" of courts.  *Id*. at \*4 (quoting *Marquette Nat'l Bank v. First of Omaha Serv. Corp.,* 439 U.S. 299, 319 (1978)) (confirming that interest rates and fees can be exported from the location of a bank regardless of where borrower resides).  The court pointed out that the plaintiff could direct any concerns "about the 'rental' of national bank charters" directly to federal regulators.  *Id.*

The *Hudson* decision follows from the Eighth Circuit's decision in *Krispin v. May Dep't Stores Co.,* 218 F.3d 919 (8th Cir. 2000), which also dismissed as preempted state law usury claims challenging late fees charged on credit card accounts held by a national bank.  In *Krispin,* the Court found preemption under federal interest provisions applicable to national banks (on which Section 27 of the FDIA was based), rejecting the plaintiff's argument that state usury laws should apply to receivables purchased from the bank on a daily basis by a non-bank participant in the credit card program (a store that accepted the credit cards).  *Id.* at 923-24.  As in *Hudson,* the Eighth Circuit looked "to the originating entity (the bank), and not the ongoing assignee (the store)."  *Id.* (*citing FDIC v. Lattimore Land Corp.,* 656 F.2d 139, 147-49 (5th Cir. 1981)).

Here, it is undisputed that CIT Bank, an FDIC-insured bank, contracted with Plaintiff to establish a credit account, funded a loan to Plaintiff by disbursing proceeds to Cyberpower, Inc. to pay for the computer he purchased, and held the rights to that loan's receivables; it is also undisputed that CIT Bank (and now WebBank, also an FDIC-insured bank) maintained an on-

31

going account relationship with Plaintiff under which he could obtain additional advances. (*See* FAC ¶¶ 8, 34-38, 72; *cf.* Docket No. 11-21 at 1.) These conceded facts are more than sufficient to establish that the extension of credit to Plaintiff falls within Section 27's broad coverage of "any loan or . . . other evidence of debt," and thus the California limits on interest and late fees are preempted by Section 27. Accordingly, this Court should dismiss the Complaint.

### 2. Allegations About the Role of Third-Party Servicers Do Not Defeat the Application of Section 27 of the FDIA.

Plaintiff, apparently recognizing the effect of Section 27 on his claims, seeks to plead around this provision of the FDIA in his FAC. He alleges that BML's involvement in the program defeats the applicability of Section 27. (FAC ¶ 2.) But his artful pleading cannot defeat the plain language of Section 27. Moreover, Section 1867(c), together with the FDIC's own rules and guidance, confirm that loans that are serviced through contracts with third parties such as BML, fall squarely within the ambit of "any loan" subject to preemption under Section 27 of the FDIA.

As discussed above, Section 1867(c) and the FDIC expressly recognize that state banks subject to FDIC supervision can retain third parties to provide services for loan programs and can sell loans to them. (*See supra* at Section II.A.2.) The FDIC's Compliance Manual explains that such third-party relationships can benefit banks by "increasing revenues or reducing costs" and providing access to "greater expertise or efficiency for a particular activity," and that they "can enhance competitiveness, provide diversification, and ultimately strengthen the safety and soundness and [compliance management system] of the" bank. Compliance Manual § VII-5.8. The FDIC also recognizes that selling loans can "reduce or . . . limit the level of receivables held on [the bank's] balance sheet (thus reducing or limiting on-book credit risk) and/or . . . reduce or

limit the operating burden on internal resources while still generating income from credit card activities." Credit Card Activities Manual Ch. XIV.

Nonetheless, the FDIA mandates that a bank maintain continuing involvement in its loan program. The FDIA requires banks to make business decisions about the loan program and to supervise third-party service providers. Bank regulators have brought formal enforcement actions against banks for engaging in unsafe and unsound banking practices if the bank relinquishes control or oversight over the bank's loan program to a third-party servicer because of the unwarranted risk exposures to the bank,[15] or engages in predatory lending programs that harm consumers, such as payday lending programs.[16] When bank examinations reveal that banks and third parties are violating applicable federal and state laws, the FDIC has exercised its enforcement authority to impose strict sanctions. For example, in 2008, the FDIC exercised its enforcement authority against subprime credit card programs where a third party provided services for state-chartered banks.[17] The FDIC secured restitution payments of more than $114 million, and civil money penalties of more than $5 million, from both the banks and their non-

---

[15] *See* www.occ.gov/static/enforcement-actions/ea2001-104.pdf (consent order between the Office of the Comptroller of the Currency, which supervises national banks, and Eagle National Bank, requiring bank to exit third-party relationships).

[16] Plaintiff's loan contains none of the predatory lending aspects of payday loans, which entail expensive short-term loans at annual percentage rates of several hundred percent, and which consumers are forced to renew repeatedly because of an inability to repay. *See, e.g.,* 72 Fed. Reg. 50580, 50581-82 (Aug. 31, 2007) (identifying predatory characteristics of payday lending and adopting final rule to limit such practices).

[17] Relevant orders are available at www.fdic.gov/bank/individual/enforcement/2008-12-03.pdf; www.fdic.gov/bank/individual/enforcement/2008-06-02.pdf; www.fdic.gov/bank/individual/enforcement/2008-06-04.pdf, www.fdic.gov/bank/individual/enforcement/2008-06-15.pdf; www.fdic.gov/bank/individual/enforcement/2008-10-03.pdf; www.fdic.gov/bank/individual/enforcement/2008-10-20.pdf; www.fdic.gov/bank/individual/enforcement/2009-03-19.pdf.

33

bank partner. *Id*. Some commentators argue that the public would be well served if *more* lending programs were offered through "a contractual relationship with a bank" because the FDIC's "regulatory scheme . . . has demonstrated the potential to be extremely effective in curbing predatory lending practices."[18]

The FDIC's regulation of loan programs involving banks and third parties demonstrates that the FDIC treats loans made pursuant to such programs as loans subject to and governed by the provisions of the FDIA. As "the issuer of record" with respect to the loan, it is the bank that "always retains ultimate responsibility for the program," even if a third party handles a majority of the operational duties. FDIC Credit Card Activities Manual, Ch. XIV. It would be anomalous for FDIC to treat the loans made pursuant to such lending programs as loans for examination purposes under the FDIA, and yet for courts, construing the sweeping language of Section 27 of the FDIA, not to treat them as falling within the rubric of "any loan or . . . other evidence of debt." 12 U.S.C. § 1831d. Thus, Congress's and the FDIC's determination that the bank is the lender for examination purposes, notwithstanding the involvement of a third party providing services to the bank, establishes that the bank is also the lender making a loan for purposes of Section 27.

### 3. Allegations About the Sale of Receivables Do Not Defeat the Applicability of Section 27 of the FDIA.

Plaintiff also tries to avoid Section 27 by alleging that the bank's role in the program is a matter of "form over substance" because the bank sells the receivables to the service provider after originating the loan. (*See, e.g.,* FAC ¶¶ 58, 66.) A basic tenet of usury law, however, is that the assignment of a loan is irrelevant to whether a transaction is usurious. Under federal and

---

[18] Elizabeth R. Schlitz, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and its Effect on Predatory Lending Regulations,* 88 Minn. L. Rev. 518, 625 (Feb. 2004).

California law, assignees of a loan can collect the interest rate that the original creditor could have collected if it had never sold the loan. *See, e.g., FDIC v. Lattimore Land Corp.,* 656 F.2d 139 (5th Cir. 1981); Cal. Const. art. XV, § 1 (providing that "any successor in interest to any loan or forbearance [is] exempted"). Courts look to the identity of the original creditor because "[t]he non-usurious character of a note should not change when the note changes hands." *Lattimore Land Corp.,* 656 F.2d at 148-49; *Olvera v. Blitt & Gaines, P.C.,* 431 F.3d 285, 288 (7th Cir. 2005) (common law of assignments allows assignee to collect interest at rate allowed to originating creditor); *Munoz v. Pipestone Fin., LLC,* 513 F. Supp. 2d 1076, 1079 (D. Minn. 2007) (state law claim for excessive interest against loan assignee preempted).

This principle applies directly here. Plaintiff admits that CIT Bank and now WebBank fund the loans in the first instance, ██████████████████████████████ ██████████████████████████████████ The bank thus maintains the direct contractual relationship with the borrower for the account while parting with specific receivables. Courts recognize that the sale of receivables is distinct from ownership of an account, and that retention of the account relationship establishes the bank as the lender. In *Tostado v. Citibank (South Dakota), N.A.,* No. 09-549, 2010 U.S. Dist. LEXIS 228 (W.D. Tex. Jan. 4, 2010) (unpublished), a plaintiff brought a putative class action disputing the right of a bank to enforce credit card agreements after it sold and conveyed "all its right, title, and interest in" the "receivables." *Id.* at *2. The court dismissed the case because, like here, no dispute existed that the bank still owned the accounts. *Id.* at *7-8. As the owner, the bank was entitled to enforce the agreements, even though the financial benefits would flow to the owner of the receivables. *Id.* at *8. Similarly, it is undisputed that WebBank (and previously CIT Bank) maintains an ongoing account relationship with each borrower, and thus even accepting the

35

FAC's allegations of a sale of receivables after the loan is funded, Section 27 and its preemption provision applies to that relationship because the statute applies to "any  loan."

Recognition of the rights of assignees is essential to the important role of banks as financial intermediaries. *See* OCC Interpretive Letter No. 948 (Oct. 23, 2002)[19]  ("[W]hen reduced to their essence, [ ] banks serve as financial intermediaries for the public.  In other words, the public looks to banks to facilitate the flow of money and credit among different parts of the economy.").  Especially in recent years, banks have played an important intermediary role between borrowers for whom the banks originate loans and the secondary market in which investors indirectly provide capital for such loans.  *See, e.g., Banking and Financial Services* § 5.07, at 5-44, 5-46.  If a transfer of a loan or receivable to a third party resulted in the application of new usury rules, it would inhibit the bank's ability to make the loan in the first instance: the bank would either need to consider the applicable rates and fees that could be charged by potential assignees, or would be forced to carry the loans itself indefinitely.  As the Seventh Circuit reasoned in *Olvera*, this would only serve "to make the credit market operate less efficiently," to the ultimate detriment of borrowers.  431 F.3d at 288.  These considerations are applicable not only in consideration of consumer credit programs like the one involved here, but also in residential mortgage and automobile loan programs in which there are very developed secondary loan markets.

Section 27 applies to the loan made to Plaintiff in this case, even though Plaintiff alleges that BML had an agreement to purchase receivables from CIT Bank or WebBank before they were originated.  Such pre-origination commitments, which are common in secondary market arrangements, do not alter the undisputable facts that the bank originates the loan and that the

---

[19] Available at http://www.occ.gov/static/interpretations-and-precedents/dec02/int948.pdf.

36

FDIA and FDIC supervision apply to that origination activity, including any services provided by a third party.  *See* Parts II.A.2, II.B.2, *supra*.

Furthermore, the principal federal statute governing consumer lending, the Truth in Lending Act ("TILA"), requires Defendants to disclose the bank as the lender.  15 U.S.C. § 1601 *et seq*.  TILA and its implementing regulations define "creditor" for purposes of consumer loans as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness" (15 U.S.C. § 1602(g); 12 C.F.R. § 226.2(a)(17)(i)), even if the lender never collects one penny and always intends to "simultaneous[ly]" assign the loan to a third party.  12 C.F.R. pt. 1026, Supp. I, Comment 2(a)(17)(i)-2.  Related federal statutes should be construed consistently, *see FDA v. Brown and Williamson Tobacco Corp.,* 529 U.S. 120, 132-33 (2000), whereas Plaintiff's position would introduce confusion and uncertainty about who is the lender for purposes of federal regulations, obstructing the achievement of the purposes animating both TILA and Section 27.

### 4.   Allegations About Evasion of Regulation Do Not Defeat Application of Section 27.

Plaintiff also alleges that treating his contract as involving a loan from a state-chartered bank rather than from BML would allow the loan and BML to escape regulation.  (FAC ¶¶ 2-3, 7, 10-11.)  These allegations cannot be reconciled with federal law.  WebBank's conceded role in originating the loan subjects the program and BML to regulatory scrutiny and accountability under the FDIA – including the FDIC's detailed and mandatory examination and supervision, which are part and parcel of the interest rate authority granted in Section 27 – and therefore a full panoply of loan regulation and consumer protection.  Far from evading regulation, application of the FDIA results in extensive FDIC supervision of the loan program and examination for compliance with all applicable federal and state laws.  Borrowers can also address complaints

37

about the program to the FDIC, which investigates them.[20]   This extensive supervision of banks, moreover, has long been recognized as a basis for exempting banks from state usury laws:

> the legislature might have decided that the danger which the [usury] statute was intended to prevent would not exist in any considerable degree in loans made by institutions which were under the supervision of bank commissioners.

*Mutual Loan Co. v. Martell,* 222 U.S. 225, 235 (1911) (*citing Griffith v. Conn.,* 218 U.S. 563 (1910)); *see also In re Lara (Zager v. Lara),* 731 F.2d 1455, 1460 (9th Cir. 1984) (citing similar rationale for California's usury exemption for licensed real estate brokers); Commissioner's Opinion OP 6317CnFL, Cal. Dep't of Corps. (July 20, 1993) (Utah industrial loan company (now known as an industrial bank) exempt from licensing requirements under California lending law "by virtue of the regulation of the [company] under the [FDIA] . . . ."); *accord Marine Bank v. Weaver,* 455 U.S. 551, 558 (1982) (concluding bank-issued certificates of deposit are not securities, citing the "comprehensive set of regulations governing the banking industry").

Ultimately, Plaintiff is seeking to defeat Congress' purpose in enacting Section 27. Congress enacted Section 27 to encourage FDIC-insured state banks to bolster the economy by allowing them to extend credit under uniform and predictable interest rate limits through preemption of state usury laws.  Restricting Section 27 to only those loan programs where some (undefined and undefinable) level of services are performed directly by a state bank would limit the loan programs that enjoy federal usury preemption and thus discourage state banks from making credit available to businesses and consumers nationwide.

The FDIC – statutorily charged with responsibility for the safe and sound operation of banks, and possessing broad supervisory powers – is in a far better position than courts to oversee programs such as the one challenged here.  Questions such as whether a bank is

---

[20] The FDIC's online complaint form is available at https://www2.fdic.gov/starsmail/index.asp.

delegating too many responsibilities to third parties, is adequately involved in its lending programs, adequately supervises its service providers, or should keep adequate receivables on its books, are all subjects on which the FDIC has issued guidance and examines the bank. Judgments on these questions would affect not only the specific program at issue, but other activities in which a bank could engage. For example, if a bank must retain all of its loans and receivables on its balance sheet and cannot sell receivables generated in the ordinary course of business, its ability to extend credit and generate revenues will be substantially impaired. Imposing such a requirement case-by-case and program-by-program through litigation would create uncertainty and inefficiency in the credit markets and defeat an express purpose of Section 27 of the FDIA. In sum, this program does not evade regulation, but is subject to Section 27 precisely because it is subject to extensive regulation and examination by the FDIC.

### 5.      The *Vaden* and *Ubaldi* Cases Are Inapposite.

Plaintiff and the California district court relied upon *Vaden* as requiring the Court to consider additional facts before deciding the question of preemption. *Vaden* is of no assistance to Plaintiff, particularly at this stage of the proceedings. *Vaden* adopts a standard for determining when a bank is a real party in interest entitled to remove an action to federal court based on *complete* preemption needed to provide federal question jurisdiction.[21]   For a state law claim to be completely preempted under the federal usury laws, a court must conclude that – notwithstanding artful pleading – the allegations concern activities of a bank. In that setting, courts such as *Vaden* have looked beyond the pleadings and, indeed, defendants that seek to

---

[21] For the same reason, other cases cited by Plaintiff in the FAC and in the California proceedings are irrelevant. (FAC ¶ 75 (*citing Flowers v. EZPawn Okla., Inc.,* 307 F. Supp. 2d 1191, 1205 (N.D. Okla. 2003).)  "Complete preemption" cases deal with a federal jurisdiction doctrine in light of "artful pleading," not the substantive question of whether federal law preempts state law.

39

remove based on complete preemption under the federal usury laws traditionally must supply evidence that they are the real party in interest in order to support removal.

At this point in the proceedings, there is no question that this court has subject matter jurisdiction, and there is no longer is any question that WebBank is a real party in interest. That was resolved when WebBank was allowed to "intervene as a Defendant," both permissively and as a matter of right, because it had demonstrated its legally protectable interests in the program and the loan made to Plaintiff. (Docket No. 11-21 at 9.) The District Court did not resolve that question until *after* ruling on the original motion to dismiss. Because a bank already is a party to these proceedings, this motion concerns the limited question never reached in *Vaden* - whether WebBank and the other Defendants can invoke Section 27 of the FDIA as a preemption defense on the merits to state law claims. For all the reasons set forth above, express preemption under Section 27 is straightforward because it extends to "any loan" or "other evidence of debt," and does not require the Court to develop the facts relevant to complete preemption.

One recent case denied a motion to dismiss based on a conflict preemption defense under the relevant banking statutes where a plaintiff alleged a third party was the "de facto" lender – *Ubaldi v. SLM Corp.,* No. 11-1320, slip op. (N.D. Cal. Feb. 13, 2012) (Order Granting in Part and Denying in Part Motion to Dismiss) ("*Ubaldi*"). In that case, the plaintiff challenged late fees charged on an educational loan as violating Cal. Civil Code § 1671. The loan documents identified a national bank based in Oklahoma as the lender. Plaintiff, however, sued Sallie Mae as the "de facto" lender because Sallie Mae disbursed the funds for the loan, marketed and serviced the loan, and acquired the loan through a forward purchase agreement.

Sallie Mae moved to dismiss the California claims as preempted by 12 U.S.C. § 85 of the National Bank Act. Sallie Mae did not present the magistrate judge in *Ubaldi* with the relevant

40

regulatory background imposed by Congress and the federal banking agencies on the bank lender or the third parties who work with them.  Instead, Sallie Mae argued it was entitled to preemption on the sole ground that the bank was identified as the lender in the loan documents. After surveying the cases cited by the parties, the magistrate concluded that, with the exception of *Hudson*, the authorities were not directly on point, and the motion presented an issue of first impression in the Ninth Circuit.  Rather than resolve the legal issue, the magistrate deemed the theory of liability "novel or extreme,'" and based on pre-*Twombly* Ninth Circuit case law, allowed the case to proceed to discovery.  *Id*. at 8 (quoting *McGrary v City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004)).  *Ubaldi* did not hold that the bank was not the lender, or that the federal usury laws did not apply to the national bank.

More importantly, *Ubaldi* dealt with a narrow legal question – whether merely naming a national bank in loan documents suffices for federal preemption.  And it did so on materially different facts than those admitted here.  The *Ubaldi* plaintiff disputed that the bank even funded his loan, whereas Plaintiff here admits that WebBank, like CIT Bank before it, funds the loans. Unlike the bank in *Ubaldi*, WebBank (like CIT Bank) also retains ownership of the accounts, and that ownership gives WebBank a legally protectable interest in the underlying loans. *Tostado,* 2010 U.S. Dist. LEXIS 228, at *2, *7-8.  Furthermore, unlike the bank in *Ubaldi,* WebBank (like CIT Bank) holds the loans before selling them.  In fact, WebBank retains interest during the period it holds the receivables, shares in the upside ██████████████████ ████████████; Docket No. 11-21 at 9); and benefits when account holders seek further extensions of credit using their accounts, which WebBank owns.  The bank in *Ubaldi* was not alleged to have any comparable financial stake or ongoing involvement in the loan relationship.

41

There is no indication that the court in *Ubaldi* would not have followed *Hudson* had the alleged facts there been comparable to those alleged or admitted here.

*Ubaldi* also conflicts with Supreme Court and Tenth Circuit precedent regarding Rule 12(b)(6) motions. Post-*Twombly,* the only relevant question is whether a plaintiff has alleged legally sufficient facts. *Cohon v. State Dep't of Health*, 646 F.3d 717 (10th Cir. 2011). Even before *Twombly*, the 10th Circuit never adopted the Ninth's Circuit practice of allowing complaints to survive the pleading stage merely because they present "novel or extreme" theories. *See* 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357 (3d ed. 2011). *See also Lieberman v. A & W Restaurants, Inc.,* No. 02-2930, 2003 WL 21252008, at *7 (D.C. Minn. 2003) (unpublished) (dismissing complaint and noting that "even creative and inventive legal theories must comport with Rule 12 standards").

For all of these reasons, *Vaden* and *Ubaldi* either are legally and factually distinguishable, or should be deemed wrongly decided. As the court in *Hudson* cautioned, regulators are better positioned to evaluate whether lending programs involving banks and third parties comply with applicable federal and state law, and to issue sanctions when they do not. *Hudson*, 2002 U.S. Dist. LEXIS 11226, at *16. "[A]s a matter of statutory construction," Plaintiff's "uncertain and unpredictable" approach to preemption is legally untenable, and should be rejected. *Id.* at *16.

## III.    <u>PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.</u>

Plaintiff has taken multiple bites at the apple during the course of this litigation. Yet each iteration of Plaintiff's complaint has suffered from the same fundamental defects that preclude him from recovering on any of the asserted claims. Plaintiff already has been given a chance to amend his complaint, and was given that opportunity after one round of briefing on dispositive motions with the original Defendants, and a second round of briefing with Defendant-Intervenor

42

WebBank.  Plaintiff also had the benefit of amending his complaint more than six months after receiving nearly 200,000 pages of discovery from the Defendants.  Despite the tremendous expenditures of time, energy, and money that have resulted from Plaintiff's unmeasured approach to this litigation, Plaintiff's latest version of the operative complaint still fails to make a plausible showing of entitlement to relief for any of the asserted claims.  In these circumstances, amendment should be deemed futile, and the complaint should be dismissed with prejudice.  *See Anderson v. First Sec. Corp.,* 249 F. Supp. 2d 1256, 1263 (D. Utah 2002) (dismissing with prejudice stock purchasers' amended complaint and proposed class action alleging violation of federal securities laws where, despite ample opportunity for discovery, plaintiffs failed to sufficiently articulate how defendants violated Generally Accepted Accounting Practices).

43

## CONCLUSION

For the reasons stated above, Plaintiff's Complaint should be dismissed with prejudice.

Respectfully submitted this 5th day of March, 2012.

SIDLEY AUSTIN LLP

/s/ Gary Bendinger
Gary Bendinger
gbendinger@sidley.com

(*Signed by Brent E. Johnson with permission of Gary Bendinger*)

Mark E. Haddad (admitted *pro hac vice*)
mhaddad@sidley.com
Sean A. Commons (admitted *pro hac vice*)
scommons@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: (213) 896-6000
Fax: (213) 896-6600

*Attorneys for Defendant WebBank*

PAUL HASTINGS LLP

/s/ Thomas P. Brown
Thomas P. Brown
tombrown@paulhastings.com
PAUL HASTINGS, LLP
55 Second Street, Twenty-Fourth Floor
San Francisco, CA  94105
Telephone: (415) 856-7000
Facsimile: (415) 856-7100

(*Signed by Brent E. Johnson with permission of Thomas P. Brown*)

44

HOLLAND & HART LLP

/s/ Brent E. Johnson
Brent E. Johnson
bjohnson@hollandhart.com
Rebecca A. Ryon
raryon@hollandhart.com
HOLLAND & HART LLP
222 South Main, Suite 2200
Salt Lake City, Utah  84101
Telephone: (801) 799-5800
Facsimile: (801) 799-5700

*Attorneys for Defendants Bill Me Later, Inc., eBay Inc., and PayPal, Inc.*

45

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2012, I electronically transmitted the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6)** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Thomas P. Brown tombrown@paulhastings.com, laurakelley@paulhastings.com

Gary F. Bendinger gbendinger@sidley.com

Steve W. Berman steve@hbsslaw.com, jeanethd@hbsslaw.com, sf_filings@hbsslaw.com

Rebecca A. Ryon raryon@hollandhart.com, tjones@hollandhart.com, intaketeam@hollandhart.com, slclitdocket@hollandhart.com

Heather M. Sneddon hsneddon@aklawfirm.com, krubino@aklawfirm.com

Jeff D. Friedman jefff@hbsslaw.com, SF_Filings@hbsslaw.com, jand@hbsslaw.com

Shana E. Scarlett shanas@hbsslaw.com, jeanethd@hbsslaw.com, sf_filings@hbsslaw.com

Johari Nailah Townes jtownes@sidley.com

Mark E. Haddad mhaddad@sidley.com

Sean A. Commons scommons@sidley.com


/s/ Brent E. Johnson

5444508_1.DOC

46