IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KYLE SAWYER, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BILL ME LATER, INC., EBAY INC., PAYPAL, INC., and DOES 1-100,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:11-cv-00988<br><br>Judge Clark Waddoups |

Before the court is Defendants' Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6). (Dkt. No. 62.) The court heard oral argument on the Motion on September 20, 2012, taking the matter under advisement at that time. For the reasons discussed below, the court GRANTS Defendants' Motion (Dkt. No. 62) and dismisses Plaintiff's First Amended Complaint (Dkt. No. 49) in its entirety. The court also therefore DENIES AS MOOT Plaintiff's Motion for a Determination of Defendants' Claim of Privilege Pursuant to Fed. R. Civ. P. 26(b)(5)(B). (Dkt. No. 54.)

## BACKGROUND

Plaintiff purchased a computer online in October 2008 for $1,068.08 using eBay/Paypal's affiliated "Bill Me Later" program to finance the purchase. To effect this online loan transaction through Bill Me Later ("BML"), Plaintiff signed a contract identifying CIT Bank as the lender in the financing and as the owner of the account created by Plaintiff in using BML to purchase the computer. CIT Bank was an FDIC-insured bank chartered in Utah. The contract specified that

Plaintiff was accepting the loan in Utah, credit was being extended from Utah, an annual interest rate of 19.99% would apply to outstanding loan amounts, and disclosed a schedule for late fees. CIT Bank funded Plaintiff's transaction by paying the merchant on his behalf, then held the receivables for Plaintiff's account for at least two days before selling them to BML. On September 1, 2010, WebBank acquired all of CIT Bank's rights to this lending program and became the owner of all existing accounts (including Plaintiff's account) and the sole entity to issue new accounts and fund extensions of credit. WebBank is also an FDIC-insured bank chartered in Utah that retains the receivables on the accounts consumers choose to open with it through the BML program for two days before selling those receivables to PayPal (Europe) S.A.R.L., ET CIE S.C.A., a Luxembourg Bank. (Defs.' Mem. Supp. Mot. Dismiss 6 [Dkt. No. 63].) "WebBank retains a portion of the interest that accrues during the time it holds the receivable, shares in the upside 'when the portfolio performs well' and, as the account owner, benefits when account holders request additional extensions of credit." (*Id.* (internal citations omitted).)

BML facilitates this consumer financing for the lending bank. Consumers, including Plaintiff, provide BML with financial and other information at the point of online sale that allows BML, on the bank's behalf as its service provider, to perform a real-time credit check for purposes of determining whether the consumer qualifies for the loan to finance the transaction. If the consumer qualifies for and reviews and accepts the terms and conditions of the loan, initially CIT Bank and now WebBank opens an account for the consumer and extends the consumer credit for the purchase, paying the merchant on the consumer's behalf. The consumer-turned-borrower is then responsible for a loan account similar to a credit card account with a current balance.

If the borrower pays for the purchase in full within 30 days, there is no charge for using the service at all. If the borrower makes a payment by the due date but does not pay off the account in full, the disclosed 19.99% interest rate applies to the remaining balance. If the borrower does not make at least the minimum payment by the payment date, then just like with a typical credit card balance, a separate late fee is applied according to the disclosed late fee schedule in addition to the disclosed 19.99% interest rate that applies to the outstanding balance. Plaintiff acknowledges in the First Amended Complaint that, according to the Wall Street Journal Blog, most borrowers "pay on time and in full," meaning that there is no cost at all to them for using the BML service. (First Amended Complaint ¶ 103 [Dkt. No. 49].)[1]

The WSJ Blog post cited by Plaintiff in the First Amended Complaint notes that 35% of borrowers do not pay in full within the first 30 days, meaning they then carry a balance similar to a credit card balance with associated interest rate and late fees triggered by missing a payment due date. The First Amended Complaint cites a number of complaints from such users, including Plaintiff, who became subject to late fees based on the disclosed schedule upon missing the due date for payment on their balance, in addition to the disclosed 19.99% interest rate on that balance. Borrowers expressed outrage at the annualized "interest rates" that resulted when combining the late fees on an annual percentage basis based on the balance with the disclosed annual interest rate of 19.99%; the resulting combined annualized figure, expressed as an "interest rate," ranged from "more than a 70 percent interest rate" for Plaintiff to as high as 180% in one anonymous consumer complaint cited in an online article. (*See id.* at ¶¶ 104-115 [Dkt. No. 49].)

---

[1] Quoting Mary Pilon, *Bill Me Later Can Ding Your Credit Score Now*, WSJ Blogs: The Wallet (Dec. 9, 2008), http://blogs.wsj.com/wallet/2008/12/09/bill-me-later-can-ding-your-credit-score-now/ (last visited Feb. 1, 2012).

Plaintiff, a consumer-borrower living in California, brought this suit on his own behalf and on behalf of a class of similarly situated California consumers for alleged breach of contract (*id.* at ¶¶ 116-19), violation of California's Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*) (*id.* at ¶¶ 120-23), violation of California's Business and Professions Code sections 17200 *et seq.* by allegedly violating California's Unfair Competition Law under Cal. Civ. Code 1671(c)-(d)), California's Consumer Legal Remedies Act under Cal. Civ. Code sections 1750 *et seq.*, California's Financial Code sections 22100(a), 22324, 12304, 22001, 22109, 22320.5, the California Constitution's anti-usury provision in Section 1, Art. VX and public policy of California (*id.* at ¶¶ 124-41), violation of the California Constitution's cited usury provision (*id.* at ¶¶ 142-47), and for aiding and abetting the above against eBay Inc. (*id.* at ¶¶ 148-52). Plaintiff is seeking injunctive relief enjoining the BML service in California and an order restoring all funds "improperly received by Defendants" to California borrowers and rescinding all contracts made between borrowers and Defendants that would violate California law. (*Id.* at 38.)

Judge Otero of the U.S. District Court for the Central District of California applied a choice of law analysis to Plaintiff's usury claims, which Plaintiff had brought under California law, and dismissed those claims with prejudice on the grounds that Utah law applied to and allowed the disclosed 19.99% interest rate applicable to balances under the program. (Order dated Dec. 14, 2010, at 10 [Dkt. No. 5-6].) WebBank moved to intervene, both permissively and as of right, as a Defendant in the matter. Judge Otero granted WebBank's motion to intervene on August 8, 2011. (Civil Minutes dated Aug. 8, 2011, at 12 [Dkt. No. 11-21].) Judge Otero then granted Defendants' Motion to Transfer Venue to the U.S. District Court for the District of Utah on October 21, 2011. (*See* Civil Minutes dated Oct. 21, 2011, at 3 & 10 [Dkt. No. 16-12].)

<u>**ANALYSIS**</u>

**I.     LEGAL STANDARD**

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted). To survive a motion to dismiss, Plaintiff must plead "enough factual matter" to state "a claim to relief that is plausible on its face" when the court takes such factual matter as true, as it must at this stage of the litigation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" but is not "akin to a probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making this determination, the court must make all reasonable inferences in the favor of the non-moving party, distinguishing well-pleaded facts from conclusory allegations. *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002). "This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged." *United States v. Ledford*, No. 07-cv-01568-WYD-KMT, 2009 U.S. Dist. LEXIS 48441 at *9 (D. Colo. Feb. 9, 2009). Of course, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. 662, 678.

The court agrees with Defendants that "after setting aside the rhetoric and irrelevant allegations, the [First Amendment Complaint] cannot support a verdict for Plaintiff in light of the admitted facts and the documents Plaintiff has relied upon in this litigation." (Defs.' Mem. Supp.

Mot. Dismiss 6 [Dkt. No. 63].) Accordingly, the court dismisses the Complaint with prejudice for the reasons discussed below.

## II.    EXPRESS FEDERAL PREEMPTION OF USURY AND LATE FEE CLAIMS

As Plaintiff necessarily admits in the First Amended Complaint, the BML program is intentionally structured to take advantage of the lending ability of FDIC-insured, state-chartered banks in Utah. (*See* First Amended Complaint ¶¶ 2, 6, 10, 55, 57 [Dkt. No. 49].)[2] Under Section 27 of the Federal Deposit Insurance Act (the "FDIA"), a state-chartered, federally insured bank is authorized to impose finance charges and late fees under the governance of the usury laws of the state where the bank is located. 12 U.S.C. § 1831d. This federal statute expressly preempts "any State constitution or statute" that sets forth state usury laws prohibiting an interest rate allowed by the state in which the state-chartered, federally insured bank is located. *See id.* at § 1831d(a); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003) (holding action expressly preempted by federal law under Sections 85 and 86 of the National Banking Act, thereby justifying removal jurisdiction, because "[u]niform rules limiting the liability of national banks and prescribing exclusive [federal] remedies for their overcharges are an integral part of a banking system that needed protection from possible unfriendly State legislation") (internal citation omitted).

"Sections 85 and 86 of the National Bank Act and § 1831d of the Depository Institution Deregulation and Monetary Control Act ["DIDA"] are virtually identical. The former applies to

---

[2] Though Plaintiff characterizes this structure as "a financial shell-game" and "just a form of money laundering" (*id.* at ¶ 2), and the arrangement between the Utah banks and BML as a "rent-a-charter agreement" (*id.* ¶ 6) allegedly similar to the schemes used by "some unlawful payday lenders" (*id.* ¶ 68), the court looks to the substance of the facts alleged and not the rhetoric in which such facts are couched or the conclusory allegations pled, which, in the case of these descriptions the court finds "prolix and unnecessarily dramatic at this stage of the lawsuit." *See Benchmark Constr., LLC v. Scheiner Commer. Group, Inc.*, No. 2:12-cv-00762-CW, 2013 U.S. Dist. LEXIS 43887, *3 (D. Utah Mar. 26, 2013) (citing *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007)); *see also Ruiz*, 299 F.3d at 1181 (10th Cir. 2002) (court must distinguish well-pleaded facts from conclusory allegations).

national banks while the latter applies to state-chartered federally-insured banks." *Beaumont v. Fortis Benefits Ins. Co.*, No. 07-CV-050-GKF-FHM, 2008 U.S. Dist. LEXIS 27321, at *7 n.3 (N.D. Okla. Mar. 29, 2008). The court agrees with Judge Frizzell's observation in *Beaumont* that the same express preemption analysis governing Sections 85 and 86 of the National Bank Act applies to preemption of state usury laws under Section 27 of the FDIA and not only because the two provisions are "virtually identical" in substance, policy, and internal logic—the same constitutionally prudential considerations direct the court's analysis of Section 27's preemption of the usury and late fee claims brought under California law in this action.

Because Section 85 of the National Bank Act and Section 27 of the FDIA are "virtually identical," the court looks for guidance to precedent in which the Supreme Court addressed the application of the state usury laws and late fee provisions of the state where a bank is located to consumers residing in a foreign state with greater consumer protections under Section 85 of the National Bank Act. As to usury laws, the Supreme Court was "confronted by the inequalities that occur when a national bank applies the interest rates of its home State in its dealing with residents of a foreign State" in *Marquette Nat. Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299, 314 (1978). The Court held that under Section 85 of the National Bank Act—which, as has been noted, is "virtually identical" to Section 27 at issue here as to the interest rate that a national bank may apply—a national bank located in a particular state may charge an interest rate to out-of-state credit-card customers that would be higher than the rate that would be permitted in the customers' home states if allowed by the bank's home state. *Id.* at 308, 313-316 (holding that a national bank "located" in Nebraska, as evidenced by its organization certificate, is entitled by Section 85 of the National Bank Act to charge its

Minnesota customers the rate of interest authorized by Nebraska law even though it was higher than that allowed by Minnesota law).

Closely examining the Congressional history of Section 30 of the National Bank Act of 1864 (the predecessor of Section 85 and which was "virtually identical" to Section 85 at issue in *Marquette*, *id.* at 312 n.23, and relevant here), the Supreme Court found this approach to be consistent with the Congressional intent behind the Act:

> Whether the inequalities which thus occur when the interest rates of one State are "exported" into another violate the intent of Congress in enacting § 30 in part depends on whether Congress in 1864 was aware of the existence of a system of interstate banking in which such inequalities would seem a necessary part.
>
> Close examination of the National Bank Act of 1864, its legislative history, and its historical context makes clear that, contrary to the suggestion of petitioners, Congress intended to facilitate what Representative Hooper termed a "national banking system." Cong. Globe, 38th Cong., 1st Sess., 1451 (1864). . . .
>
> Although in the debates surrounding the enactment of § 30 there is no specific discussion of the impact of interstate loans, these debates occurred in the context of a developed interstate loan market. As early as 1839 this Court had occasion to note: "Money is frequently borrowed in one state, by a corporation created in another. The numerous banks established by different states are in the constant habit of contracting and dealing with one another. . . . These usages of commerce and trade have been so general and public, and have been practiced for so long a period of time, and so generally acquiesced in by the states, that the Court cannot overlook them . . . ." *Bank of Augusta v. Earle*, 13 Pet. 519, 590-591 (1839). Examples of this interstate loan market have been noted by historians of American banking. Evidence of this market is to be found in the numerous judicial decisions in cases arising out of interstate loan transactions. . . . After passage of the National Bank Act of 1864, cases involving interstate loans begin to appear with some frequency in federal courts. . . .
>
> We cannot assume that Congress was oblivious to the existence of such common commercial transactions. We find it implausible to conclude, therefore, that Congress meant through its silence to exempt interstate loans from the reach of § 30. We would certainly be exceedingly reluctant to read such a hiatus into the regulatory scheme of § 30 in the absence of evidence of specific congressional intent. Petitioners have adduced no such evidence.
>
> Petitioners' final argument is that the "exportation" of interest rates, such as occurred in this case, will significantly impair the ability of States to enact

> effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. *Cf.* 38 Cong. Globe, 38th Cong., 1st Sess., 2123 (1864). This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.

*Id.* at 314-19 (internal footnote citations omitted). Though *Marquette* considered the effect of this framework between banks—one national bank suing to enjoin the application in its state of a higher interest rate allowed by a competing national bank's home state—the same analysis and holding applies when viewed from the consumer's perspective, as in this case. The court finds the Supreme Court's prudential holding under Section 85—that "the protection of state usury laws is an issue of legislative policy" such that any grievance relating to their disparate application under the express preemption of Section 85 of the National Bank Act "is better addressed to the wisdom of Congress than to the judgment of this Court," *id.* at 319—to be persuasive and controlling in the context of Section 27 of the FDIA as well.

The usury analysis above is therefore controlling. The Supreme Court has also considered late fees under the analogous Section 85 of the National Bank Act, this time specifically relating to a California consumer affected by the disparate allowable fee rates as preempted by Section 85, in *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996). In *Smiley*, a California consumer brought a class action challenging the late fees charged on credit card balances by a South Dakota bank, as allowed by South Dakota law, because the consumer argued, as in this case, that such disclosed late fee charges were "unconscionable" under California law. *Id.* at 737-38. Defendant-Respondent argued, as here, that the claims were preempted by Section 85 of the National Bank Act (here, Section 27 of the FDIA). The California Supreme Court ultimately upheld the dismissal of the case based on this preemption argument. *Id.* In the course of the case,

and persuasive the United States Supreme Court's ultimate holding, the Comptroller of the

Currency adopted the following provision after the California Superior Court had dismissed the

complaint:

> The term 'interest' as used in 12 U.S.C. § 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, not sufficient funds (NSF) fees, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports.

*Id.* at 740 (quoting 61 Fed. Reg. 4869, codified in 12 CFR § 7.4001(a)).

With reference to this language, the Supreme Court gave deference to the Comptroller of

the Currency's interpretation of "interest" in Section 85 as required by *Chevron U.S.A. Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "because of a presumption that

Congress, when it left ambiguity in a statute meant for implementation by an agency, understood

that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency

(rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Id.* at

740-41 (citing *Chevron*, 467 U.S. at 843-44). The Court rejected the petitioner's various

arguments that it should not defer to the Comptroller's interpretation including "late fees" in the

definition of "interest" under Section 85. *Id.* at 740-42. Because "there is no doubt that § 85 pre-

empts state law" and the definition of "interest" within Section 85 "does not . . . deal with pre-

emption," objections to the Comptroller's definition of "interest" preempting state law along

with the usury provision of Section 85 itself must fail. *Id.* at 744. The petitioner in *Smiley* further

argued, with relevance here, that "the late fees charged by respondent do not constitute 'interest'

because they do not vary based on the payment owed or the time period of delay." *Id.* at 745. The

Supreme Court also dismissed this contention, observing that "[w]e do not think that such a limitation must be read into the statutory term." *Id.* The *Smiley* Court explained that

> [t]he definition of "interest" that we ourselves set out in *Brown v. Hiatts*, 82 U.S. 177 (1873), decided shortly after the enactment of the National Banking Act, likewise contained no indication that it was limited to charges expressed as a function of time or of amount owing: "Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money or as damages for its detention." *See also Hollowell v. Southern Building & Loan Ass'n*, 120 N.C. 286, 26 S.E. 781 (1897) ("Any charges made against [the borrower] in excess of the lawful rate of interest, whether called 'fines,' 'charges,' 'dues,' or 'interest,' are in fact interest, and usurious.").

*Id.* Though it is controlling for this case, and Defendants discussed it in their Motion to Dismiss (*see, e.g.*, Defs.' Mem. Supp. Mot. Dismiss 30 [Dkt. No. 63]), Plaintiff nowhere addresses *Smiley* in his Opposition. This was a fatal flaw in Plaintiff's argument.

The court also agrees with Defendants that the interest rate authority of 12 U.S.C. § 1831d(a) "is part and parcel of the regulatory structure governing state banks under the FDIA." (Defs.' Mem. Supp. Mot. Dismiss 28 [Dkt. No. 63] (citing 12 U.S.C. §§ 1463(g) (savings banks), 1735f-7 (mortgage lenders), and 1785(g) (credit unions) as other areas of federal regulation of the banking industry added by the DIDA at the same time as § 1831d).) As Defendants note, the Congressional intent behind the DIDA, enacted in 1980 in response to the credit crunch of the late 1970s, was to promote lending by state-chartered banks and therefore gave the FDIC, as the federal regulator, regulatory oversight and authority over "all aspects of a bank's operations." (*Id.* at 28-29 (citing statement of Sen. Proxmire, 126 Cong. Rec. 6900 (March 27, 1980)).) As the primary regulator of such federally insured, state-chartered banks, the FDIC is required to examine these banks and their business operations periodically for compliance with the governing federal regulatory framework. *See, e.g.*, 12 U.S.C. § 1820(d)(1) ("The appropriate Federal banking agency shall, not less than once during each 12-month period, conduct a full-

scope, on-site examination of each insured depository institution."); 12 C.F.R. § 337.12(a) ("The FDIC is required to conduct a full-scope, on-site examination of every insured state nonmember bank at least once during each 12-month period."). And, as Defendants note, the FDIC has also given specific guidance under this authority on credit card programs. (Defs.' Mem. Supp. Mot. Dismiss 29 [Dkt. No. 63].) The court finds that, even drawing all reasonable inferences in the favor of Plaintiff, as it must on a 12(b)(6) motion, based on the facts included in the First Amendment Complaint, the BML lending framework more closely resembles credit card programs than the circular payday loan structures that Plaintiff puts forward. (*Cf.* First Amended Complaint ¶¶ 68-77 [Dkt. No. 49].)

This finding also addresses Plaintiff's allegation that the structure in use in the BML program reveals that BML and not the state-chartered bank is the "true lender" and thus that the whole scheme is an obvious effort to circumvent state usury laws more protective of consumers than Utah's. Even accepting this allegation as true—that this is a lending program of a non-bank attempting to circumvent California's usury laws—the court would still be required to dismiss these claims as preempted by Section 27, as did the Southern District of Indiana in *Hudson v. ACE Cash Express, Inc.*, No. 01-1336-C, 2002 U.S. Dist. LEXIS 11226, *4 & *16 (S.D. Ind. May 30, 2002) (finding claims preempted by 12 U.S.C. § 85 despite accepting as true plaintiff's claims that a state-chartered bank played an "insignificant" role in a lending program that a non-bank had "designed for the sole purpose of circumventing Indiana usury law"). In *Hudson*, the Court deferred to the same prudential analysis followed in *Marquette*, as must the court here based on the analogy of Section 27 of the FDIA to Section 85 of the National Bank Act, noting with *Hudson* that "concerns about protection of state usury laws present questions of legislative policy better addressed by Congress," and that the plaintiff's arguments "may well appeal to

federal banking regulators concerned about the 'rental' of national bank charters." *Id.* at *16. But such an appeal to Congress or federal regulators is the correct venue for addressing such concerns under Section 27 of the FDIA as under Section 85 of the National Bank Act.

But as to the allegation that this is a lending program of a non-bank attempting to circumvent California's usury laws, as Defendants note, the Eighth Circuit has expressly "rejected arguments that state usury laws should apply to receivables purchased from the bank on a daily basis by a non-bank participant in the credit card program (a store that accepted the credit cards)." (Defs.' Mem. Supp. Mot. Dismiss 28 [Dkt. No. 63] (citing *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 923-24 (8th Cir. 2000).) In so holding, the Eighth Circuit "looked to the originating entity (the bank)" in the arrangement "and not the ongoing assignee (the store)." *Krispin*, 218 F.3d at 924. This position receives further support from the application of 12 U.S.C. § 1876(c) to the BML program. Section 1867(c) applies when "a depository institution that is regularly examined by an appropriate Federal banking agency, or any subsidiary or affiliate of such a depository institution that is subject to examination by that agency, causes to be performed for itself, by contract or otherwise, any services authorized under this Act [the "Bank Service Company Act," 12 U.S.C. §§ 1861 et seq.], whether on or off its premises." As FDIC-insured, state-chartered banks, each of CIT Bank and WebBank is a "depository institution" covered by Section 1867(c). *See* 12 U.S.C. § 1813(a)(1)-(2) & (c) (defining "depository institution" as used in Section 1813(c) to include any national or State bank defined in Section 1813(a)(1)-(2)). Thus, under Section 1867(c), when such a "depository institution" as CIT Bank or WebBank contracts with a third-party service provider for such services, "such performance shall be subject to regulation and examination by such agency to the same extent as if such

services were being performed by the depository institution itself on its own premises." 12

U.S.C. 1867(c)(1).[3]

Based on this provision, therefore, loans serviced through contracts with third parties

such as BML are included within the definition of "any loan" under Section 27 of the FDIA and

are therefore expressly preempted by the federal statute. The BML program is therefore

expressly subject to federal regulation and oversight. As Defendants explain,

> WebBank's conceded role in originating the loan subjects the program and BML
> to regulatory scrutiny and accountability under the FDIA—including the FDIC's
> detailed and mandatory examination and supervision, which are part and parcel of
> the interest rate authority granted in Section 27—and therefore a full panoply of
> loan regulation and consumer protection. Far from evading regulation, application
> of the FDIA results in extensive FDIC supervision of the loan program and
> examination for compliance with all applicable federal and state laws.

(Defs.' Mem. Supp. Mot. Dismiss 37 [Dkt. No. 63].) The FDIC has created numerous methods

of oversight and compliance with such arrangements involving credit card programs (which the

court has found above are analogous to this framework for these purposes) in which banks that

are covered "depositary institutions" contract with third party service providers in the framework

of their lending programs. (*See, e.g.*, *id.* at 27 & 32-34 (citing numerous provisions of the FDIC

Credit Card Activities Manual and relevant FDIC enforcement orders).) As Defendants note,

"[i]t would be anomalous for FDIC to treat the loans made pursuant to such lending programs as

loans for examination purposes under the FDIA, and yet for courts, construing the sweeping

language of Section 27 of the FDIA, not to treat them as falling within the rubric of 'any loan or .

. . other evidence of debt.'" (*Id.* at 34 (quoting 12 U.S.C. § 1831d).) Accordingly, the court finds

that, as suggested by Defendants, "[t]he FDIC—statutorily charged with responsibility for the

---

[3] It is unclear whether Defendants have complied with 12 U.S.C. § 1867(c)(2), "the depository institution
shall notify each such agency of the existence of the service relationship within thirty days after the
making of such service contract or the performance of the service, whichever occurs first," but that does
not appear to be at issue in this lawsuit.

safe and sound operation of banks, and possessing broad supervisory powers—is in a far better position than courts to oversee programs such as the one challenged here." (*Id.* at 38.)

Plaintiff's arguments that the banks in the BML program are not the true lender or the real party in interest are unavailing and cannot overcome this fundamental prudential argument. (*See* Pl.'s Opp. Mot. Dismiss 31-49 [Dkt. No. 82].) Plaintiff notes that Judge Otero rejected the express preemptive effect of Section 27 of the FDIA, finding that under *Discover Bank v. Vaden*, 489 F.3d 594, 602 (4th Cir. 2007), *rev'd on other grounds by Vaden v. Discover Bank*, 129 S. Ct. 1262 (2009), "CIT was not necessarily the real party-in-interest, because Bill Me Later held the right to set interest and fees, amend the terms and conditions, and control other aspects of the agreement." (*Id.* at 31 (citing Order dated Dec. 14, 2010, at 13-14 [Dkt. No. 5-6]).) The court, however, must correct any error it discovers in previous, non-final orders. In examining Judge Otero's Order and analysis, the court cannot agree that Plaintiff has alleged facts sufficient to plausibly suggest that Defendants, and not CIT or WebBank, are the real parties-in-interest to the loans or that *Vaden* necessarily allows such an inference. In fact, the court finds *Vaden*, a case relevant to questions of complete preemption in which a court must consider whether a case can be properly removed to federal court based on federal question jurisdiction, inapposite here where the case is already properly in federal court. The court similarly finds *Flowers v. EZPawn Okla., Inc.*, 307 F. Supp. 2d 1191, 1205 (N.D. Okla. 2003) inapplicable to the facts here, for the same reason, dealing as it does with the issue of complete preemption for removal jurisdiction.

More substantively, however, Plaintiff has alleged and must admit that FDIC-insured, state-chartered banks are parties to the relevant credit agreements under which the loans are made, funded the loans at issue and owned the credit accounts, and that WebBank holds the credit receivables for two days, continues to own the accounts, and shares in the financial upside

of the program based on the amount of interest collected. (*See* First Amended Complaint ¶¶ 6, 8, 59, 86-87, 93, 95, 98 [Dkt. No. 49].) Also, Defendants have cited cases permitting non-bank assignees to continue to "charge" and "collect" the interest rates permitted by Section 27. *See FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148-49 (5th Cir. 1981) (the identity of the original creditor is dispositive because the "non-usurious character of a note should not change when the note changes hands"); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005) (common law of assignments allows assignees to collect interest at rate allowed to originating creditor); *Munoz v. Pipestone Fin., LLC*, 513 F.Supp.2d 1076, 1079 (D. Minn. 2007) (state law claim for excessive interest against loan assignee preempted), each of which survive Plaintiff's attempt to distinguish their applicability to the facts of this case in his Opposition.

More importantly, the court also finds *Ubaldi v. SLM Corp.*, No. 11-01320-EDL, 2012 U.S. Dist. LEXIS 17298 (N.D. Cal. Feb. 13, 2012) to be distinguishable and therefore unhelpful to Plaintiff's position. Although the Court in *Ubaldi* denied the motion to dismiss based on the plaintiff's allegations that a third party was the "de facto" lender where the loan documents nevertheless identified a national bank as the lender, the entity the plaintiff alleged was the "de facto" lender had performed services such as disbursing funds and marketing and had acquired the loan through a forward purchase agreement. The magistrate judge allowed the case to proceed citing pre-*Twombly* Ninth Circuit caselaw, finding that the defendant's theory that the case was preempted by Section 85 of the National Bank Act was one of first impression in the Ninth Circuit.[4] But as Defendants note, "*Ubaldi* did not hold that the bank was not the lender, or that the federal usury laws did not apply to the bank." (Defs.' Mem. Supp. Mot. Dismiss 41 [Dkt.

---

[4] As Defendants argue, "Even before *Twombly*, the Tenth Circuit never adopted the Ninth Circuit's practice of allowing complaints to survive the pleading stage merely because they present 'novel or extreme' theories," which is the approach taken by the Northern District of California in *Ubaldi*. (*See* Defs.' Mem. Supp. Mot. Dismiss 42 [Dkt. No. 63].)

No. 63].) Moreover, the plaintiff in *Ubaldi* disputed that the bank even funded his loan. By contrast, here, it is undisputable that CIT Bank and WebBank funded the loans, retained ownership of the accounts giving them a legally protectable interest in the underlying loans, held the loans before selling them, and that "WebBank retains interest during the period it holds the receivables, shares in the upside when the portfolio performs well, and benefits when account holders seek further extensions of credit using their accounts, which WebBank owns." (*Id.* at 41 (internal quotation marks and citations omitted).) *Ubadli*, thus distinguished, provides Plaintiff no support.

As alleged, Plaintiff's First Amended Complaint cannot satisfy the plausibility standard of *Twombly* and *Iqbal* sufficient for the allegations to state a claim for which relief can be granted in light of the express preemption of Section 27 of the FDIA of Plaintiff's usury and late fee claims. "Section 27 represents Congress's considered judgment that banks, subject to extensive regulation and supervision, should be entitled to charge interest as allowed by the laws of their home states." (Defs.' Reply 18 [Dkt. No. 90].) CIT Bank and WebBank are FDIC-insured state-chartered banks in the State of Utah. Plaintiff cannot allege that Utah does not allow the interest rates and late fees disclosed and then charged under the BML program. Plaintiff's claims therefore fail as a matter of law and are dismissed with prejudice.

## III. BREACH OF CONTRACT, CLRA, BUSINESS AND PROFESSIONS CODE, CALIFORNIA CONSTITUTION, AND AIDING AND ABETTING CLAIMS

The court considers the express preemption of Section 27 of the FDIA to be dispositive of the entire First Amended Complaint. Nevertheless, for the avoidance of doubt, the court separately addresses the Breach of Contract, CLRA, Business and Professions Code, California Constitution, and Aiding and Abetting claims, dismissing each in their own right.

Each of the above claims is premised on BML being the true lender or real party-in-interest, an allegation dismissed by the court under the *Twombly* and *Iqbal* standards above. Relatedly, the claims are further rooted in Plaintiff's theory that BML "operated an instant, transactional credit plan that consumers used at the point-of-sale to check out and make online purchases of particular goods and services." (*See* First Amended Complaint ¶ 47 [Dkt. No. 49].) Plaintiff alleges in his breach of contract claim, for example, that as a provider of such "transactional credit," BML's late fees are an impermissible liquidated damages provision, thus voiding the contract under California Civil Code § 1671(d). (*Id.* at ¶¶ 116-19.) Setting aside the fact that this is in essence a claim that the contract is void or voidable rather than a breach of contract claim, it fails for the same reason as the CLRA claim even under California law—because Plaintiff has failed to allege facts sufficient to show that BML is plausibly the true lender under the BML program such that the program plausibly constitutes only a "transactional credit" arrangement, especially in light of the court's finding above that based on the facts alleged in the First Amended Complaint, this program is analogous to credit card programs.

Further, although Plaintiff must admit that under well-established California precedent, California's Consumers Legal Remedies Act (California Civil Code sections 1750 *et seq.*) ("CLRA") does not apply generally to extensions of credit because California courts have refused to extend the CLRA to transactions when an entity other than the seller of retail goods extends the credit or to consider the mere extension of credit as a covered "service,"[5] Plaintiff hopes to use this description of the loan at issue as "transactional credit" to shoehorn the facts of

---

[5] *See, e.g.*, *Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1359 (N.D. Cal. 2007) (finding that the CLRA does not apply unless "the seller of the goods or services happens to be the one extending credit"); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172, 1175 (E.D. Cal. 2007) (credit card purchases); *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 956-57 (N.D. Cal. 2009) (debit card purchases); *Bottoni v. Sallie Mae, Inc.*, No. 10-3602, 2011 U.S. Dist. LEXIS 18874, at *31-*32 (N.D. Cal. Feb. 11, 2011) (student loans); *Reynoso v. Paul Fin., LLC*, No. 09-3225, 2009 U.S. Dist. LEXIS 106555, *28-*29 (N.D. Cal. Nov. 16, 2009) (mortgages).

this case into the contours of the CLRA. But "[t]he CLRA prohibits 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.'" *Ball v. FleetBoston Financial Corp.*, 164 Cal. App. 4th 794, 798 (2008) (quoting Cal. Civ. Code § 1770(a)). The California Supreme Court has held that "[r]ather than applying to all businesses, or to business transactions in general, the Consumers Legal Remedies Act applies only to transactions for the sale or lease of consumer 'goods' or 'services' as those terms are defined in the act." *Fairbanks v. Super. Ct.*, 205 P.3d 201, 206 (Cal. 2009).

*Fairbanks* involved life insurance policies which in many ways function like extensions of credit. The California Supreme Court disagreed with the plaintiff's argument that "if life insurance policies by themselves are not services as defined in the Consumers Legal Remedies Act, the work or labor of insurance agents and other insurance company employees in helping consumers select policies that meet their needs, in assisting policyholders to keep their policies in force, and in processing claims are services that are sufficient to bring life insurance within the reach of the Consumers Legal Remedies Act." *Id.* Instead, the *Fairbanks* Court noted that "ancillary services are provided by the sellers of virtually all intangible goods—investment securities, bank deposit accounts and loans, and so forth. The sellers of virtually all these intangible items assist prospective customers in selecting products that suit their needs, and they often provide additional customer services related to the maintenance, value, use, redemption, resale, or repayment of the intangible item." *Id.* Accordingly, *Fairbanks* held that "the ancillary services that insurers provide to actual and prospective purchasers of life insurance do not bring the policies within the coverage of the Consumers Legal Remedies Act." *Id.*

The court agrees with Defendants that *Fairbanks* undermines the various cases Plaintiff cites in favor of his "transactional credit" theory of the credit extended by the Utah banks in the BML program. This is particularly the case with Plaintiff's attempted reliance on *Berry v. American Express Publishing*, 147 Cal. App. 4th 224 (2007) to bring these facts within the CLRA. In *Berry*, a plaintiff brought a class action for holders of American Express cards who were charged for and began receiving a magazine published by AMEX Publishing entitled "Travel + Leisure" despite not having ordered the magazine. The *Berry* Court held that "neither the express text of CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act." *Id.* at 233. Plaintiff sees this language in *Berry* as creating space for the theory that where credit is extended by a third-party for the purchase of a specific good or service, then the CLRA applies to such a "transaction." But that is neither what *Berry* held nor a necessary inference from the *Berry* language cited above, as shown by subsequent Courts' use of the *Berry* holding.

For instance, in *Ball*, the plaintiff tried to make a very similar argument to Plaintiff here, that "when [she] entered into the standard form credit card account agreement with Bank of America, it was a transaction intended to result in the sale or lease of goods o[r] services to [her]." 164 Cal. App. 4th at 798. But as the *Ball* Court held, "the act of extending credit alone is not covered by the CLRA." *Id.* None of the Defendants here were selling Plaintiff any good or service as defined in the CLRA, as firmly established in the California courts. The fact that the credit was extended for the purchase of a specific item by an unrelated third-party seller does not change the legal application of the CLRA, regardless of Plaintiff's creative attempt to achieve this result through describing the arrangement as "transactional credit." Plaintiff argues that "[w]here, as here, the extension of credit is tied to the sale or lease of a particular good or

service, it is immaterial if a third party extends the credit." (Pl.'s Opp. Mot. Dismiss 23 [Dkt. No. 82].) But Plaintiff cites no direct authority for this proposition; though he clearly believes this *should be* the state of the law on the issue, nothing in *Berry* or other holdings create an opening requiring such an interpretation.[6]

Even before the change in terms precipitated by CIT Bank (as the real party-in-interest) to make the BML program more explicitly open-ended rather than tied to a specific purchase, as referred to by Plaintiff (*see* Pl.'s Opp. Mot. Dismiss 19-20 [Dkt. No. 82]), the fact remains that the CLRA only applies where "the seller of the goods or services happens to be the one extending credit," and the mere extension of credit is not considered a service under California law. *Van Slyke*, 503 F. Supp. at 1359; *Fairbanks*, 205 P.3d at 206. The *Van Slyke* Court trenchantly noted that "[o]f course, plaintiffs bought goods and services with their credit cards. *But not from defendants*. [Plaintiffs] do not allege that defendants sold them any goods under the credit agreement (other than a plastic card evidencing a line of credit). And, they do not allege that *defendants sold them any services*." *Id.* (emphasis added).

Here, *Defendants* have not sold Plaintiff any goods or services. Plaintiff purchased his computer from Cyberpower Inc., a company completely unaffiliated with any of the Defendants. Cyberpower Inc., as the seller of the tangible good, neither extended credit to Plaintiff for the purchase of that good nor participated in a proprietary or tailored financing program for the purchase. Rather, BML connected Plaintiff with the lender (CIT Bank, later WebBank) and then paid the seller directly for the purchase. This explains why Judge Otero erred in finding merit to the "transactional credit" theory sufficient to overcome the motion to dismiss. (*See* Order dated

---

[6] Plaintiff cites *Corbett v. Hayward Dodge, Inc.*, 119 Cal. App. 4th 915 (2004) as indirect support for this theory. *Corbett*, however, is inapposite because it related to a claim against a car dealership for alleged misrepresentations in connection with a car loan that the dealer financed for the purchaser through Bank of America. Such seller financing, even using the services of a lending bank in the process, is not at issue here.

Dec. 14, 2010, at 15-16 [Dkt. No. 5-6]).) Judge Otero found that "[i]n contrast to credit cards, Bill Me Later's transactional credit 'is only authorized on an item-by-item basis when goods or services are being purchased.' (Compl. ¶ 35.) Thus, Bill Me Later's business model provides credit to consumers based on the specific purchase of a good, and thus, falls under the provisions of the CLRA." (*Id.* at 16.) This does not follow either logically or under the California precedent discussed above. This gives too much credence to Plaintiff's own description of the framework as "transactional credit," a term that somehow then acquires legal and distinguishing significance of its own based on conclusory allegations that do not pass muster under *Twombly* and *Iqbal*, especially in light of precedent that requires the seller to be the party extending the credit for the CLRA to apply. The CLRA claim must be dismissed together with the breach of contract claim and the other claims arising from this same inadequately pled attempt to dispositively identify BML as the true lender or real party-in-interest.

The Third, Fourth, and Fifth Causes of Action arising under California's Business and Professions Code (Cal. Civ. Code sections 17200, *et seq.*), the California Constitution art. XV § 1 (prohibiting usury), and for aiding and abetting (*see* First Amended Complaint ¶¶ 124-41; 142-47; and 148-52, respectively [Dkt. No. 49]) are similarly rooted in the preempted late usury/fee claims and the "real party in interest"/"transactional credit" claims (including claims rooted in the CLRA) that do not meet the *Twombly* and *Iqbal* plausibility standard and must be dismissed together with those claims for the reasons set forth above.

## CONCLUSION

The court GRANTS Defendants' Motion to Dismiss (Dkt. No. 62) for the reasons discussed above and dismisses Plaintiff's First Amended Complaint (Dkt. No. 49) in its entirety. The court also therefore DENIES AS MOOT Plaintiff's Motion for a Determination of Defendants' Claim of Privilege Pursuant to Fed. R. Civ. P. 26(b)(5)(B). (Dkt. No. 54.) This case is closed.

SO ORDERED this 23rd day of May, 2014.

BY THE COURT:

Clark Waddoups
United States District Judge